15 P.3d 640 (2001)
142 Wash.2d 766
Nancy ELLWEIN and Tom Ellwein, Petitioners,
v.
HARTFORD ACCIDENT AND INDEMNITY COMPANY, a Connecticut corporation d/b/a/ The Hartford, the insurance people of ITT, Respondent.
No. 68230-5.
Supreme Court of Washington, En Banc.
Argued May 9, 2000.
Decided January 11, 2001.
As Amended January 18, 2001.
Reconsideration Denied March 7, 2001.
*641 Philip G. Arnold, Osborn Law Firm, Simeon Osborn, Susan Machler, Seattle, for Petitioner.
Ogden, Murphy & Wallace, Christopher A. Washington, Geoffrey J. Bridgman, Seattle, for Respondent.
Debra Stephens, Bryan Patrick Harnetiaux, Spokane, Amicus Curiae on Behalf of Washington State Trial Lawyers Association.
IRELAND, J.
Petitioners Nancy and Tom Ellwein seek review of the summary judgment dismissal of their claims of bad faith against Respondent Hartford Accident and Indemnity Company. At issue is whether Hartford acted in bad faith when handling the Ellweins' underinsured motorist claim. We hold that, with respect to Hartford's misappropriation of the Ellweins' accident reconstruction expert, Hartford did act in bad faith.

I. Facts
On November 28, 1989, Nancy Ellwein was driving to a work meeting when she was severely injured in an automobile accident.[1] Mrs. Ellwein was turning left in an intersection controlled by traffic lights when her car was hit by an oncoming vehicle driven by Jason Gleason. In addition to Mrs. Ellwein and Gleason, there were two other eyewitnesses, Larry Schultz and Kenneth MacDougall, who were driving vehicles near the intersection. MacDougall's vehicle suffered minor damage as a result of the accident.
Following the accident, three insurance companies became involved Respondent Hartford on behalf of Mrs. Ellwein; Allstate Insurance on behalf of Gleason; and Safeco Insurance on behalf of MacDougall. Shortly after the accident, both Allstate and Safeco brought subrogation claims against Hartford. In response to these claims, Gordon Woodley, an attorney Mrs. Ellwein and her husband hired to assert liability claims against Gleason, wrote to Hartford requesting that it not jeopardize the Ellweins' potential claims against Gleason by conceding comparative fault in resolving the property damage subrogation claims.
In December 1989, as part of its investigation of the accident, Hartford hired accident reconstruction expert William Cooper. Hartford provided Cooper with statements it had taken from eyewitnesses Schultz and MacDougall near the time of the accident. In these statements, both Schultz and MacDougall asserted that Mrs. Ellwein began her turn while the traffic light remained yellow and that Gleason struck Mrs. Ellwein's vehicle in the intersection when the traffic light was red.[2] MacDougall further asserted that when Ellwein started into the intersection, Gleason was far enough away from the light that he assumed Gleason would stop. Neither MacDougall nor Schultz, however, asserted that Gleason appeared to be speeding.
In August 1990, Cooper submitted his report. Based on the statements of Schultz and MacDougall, and his own independent calculations, Cooper determined that: (1) Gleason's estimated speed was approximately 63 miles per hour (m.p.h.), above the 45 m.p.h. speed limit for that area; and (2) while Gleason was "there to be seen" by Mrs. Ellwein, Gleason likely ran the red light when he hit Mrs. Ellwein's car.
On January 7, 1991, stating its opinion was based on Cooper's report, and noting *642 Woodley's request to refrain from admitting liability, Hartford wrote Safeco asserting that Mrs. Ellwein was not at fault regarding the accident. Internally, however, Hartford was preparing to defend itself from a "potentially large" uninsured motorist claim by the Ellweins. Clerk's Papers (CP) at 139. In an interoffice memorandum dated April 4, 1991, without notice to the Ellweins, Hartford outlined a plan to help fully understand its potential "exposures." CP at 141. Part of this plan involved Hartford conducting an independent investigation of the accident scene. The memorandum also noted that, although Cooper had "not proved entirely beneficial" as a court witness on other claims, his report could still be used to support Hartford's claim of comparative negligence by Mrs. Ellwein. In this memorandum, Mrs. Ellwein's comparative negligence was estimated to be 50 percent. See CP at 139-42.
In August 1991, Woodley wrote to Hartford notifying it of a settlement between the Ellweins and Allstate for Gleason's policy limits of $100,000, and made an Underinsured Motorist (UIM) policy limit demand.[3] Woodley asserts that Hartford misled him by stating that the UIM policy limits were only $100,000.[4] The context of this miscommunication, however, is unclear because Woodley failed to provide any further details. Nevertheless, on September 12, 1991, Hartford wrote a letter to the Ellweins clarifying that their policy limit was $1,000,000.[5]
By November 1991, however, public signs of Hartford's comparative fault defense to the uninsured motorist claim began to emerge. In response to the Ellweins' UIM arbitration demand, Hartford's attorneys wrote a letter to Woodley in which they implied that Cooper was Hartford's witness and that Cooper's conclusions might change as additional evidence was developed. Hartford proceeded by providing Cooper with the following information: (1) the investigating police officer's supplemental accident report; (2) McDougall's statement dated January 12, 1990; (3) Schultz's statement dated December 11, 1989; (4) Gleason's statement dated January 8, 1989; (5) MacDougall's transcribed statement dated November 29, 1989; (6) Gleason's transcribed statement dated November 29, 1989; (7) Schultz's declaration dated August 5, 1992; and (8) McDougall's declaration dated September 22, 1992.[6]
Much of this "new" information implicated Mrs. Ellwein as the cause of the accident. For example, both McDougall's and Schultz's versions of events changed. MacDougall opined that Mrs. Ellwein took no evasive action, and that Gleason may have entered the intersection when the light was yellow. Furthermore, Schultz now accused Mrs. Ellwein of "attempting to beat the light."
On October 7, 1992, as predicted, Cooper gave a sworn declaration in which he revised his initial findings and conclusions. Specifically, Cooper stated that: (1) Gleason entered the intersection on a yellow light, not a red light as previously reported; (2) Gleason's speed was irrelevant because he was there to be seen; (3) Gleason had no reason to believe Mrs. Ellwein would turn in front of him due to the road design; and, thus, (4) the accident was solely caused by Mrs. Ellwein's failure to yield.
On October 8, Hartford brought a motion to dismiss before the arbitrators in which it asserted that Mrs. Ellwein was solely to blame. The Ellweins responded by hiring accident reconstruction expert John Hunter. After reviewing the evidence, Hunter provided a declaration consistent with Cooper's original report. Based on Hunter's report, the arbitrators denied the motion.
*643 In a memorandum dated October 15, a Hartford employee in the Seattle office stated:
[Having] been able to get their reconstruction expert to reevaluate his position[,] we now feel there is a comparative negligence issue involved in this case in which it appears that the insured may be at fault. We have confirmed that both parties had a yellow light at the time of the accident. Our insured would then be at fault for failing to yield the right of way by making a left hand turn in front of the claimant. The injuries are still quite substantial as verified by our independent medical examination. Our defense counsel has evaluated the case in the area of $600,000$700,000. We feel that this has been cut down by at least 50% based upon comparative negligence which would put the loss below our reserve.
CP at 165.
On November 13, Hartford offered the Ellweins $300,000 to settle their UIM claim. Hartford's offer was based on its assessment that the Ellweins' gross damages equaled $800,000, discounted by 50 percent for Mrs. Ellwein's contributory negligence and $100,000 for the amount received from the Gleason settlement. The Ellweins did not accept, and prior to the arbitrator's decision, Hartford raised its offer to $400,000. Again, the Ellweins did not accept. On November 17, the arbitrator ruled that Gleason was solely at fault, and awarded the Ellweins gross damages of $929,803.39.
Following the arbitration award, the Ellweins brought suit against Hartford in federal court for bad faith and Consumer Protection Act (Chapter 19.86 RCW) violations for the handling of their UIM claim. The Ellweins voluntarily dismissed their federal suit and refiled in state court over a year later. CP at 351.
In the interim, Hartford's home office senior supervisor, William Solito, destroyed the home office file on the Ellweins' claim. Solito explained that it was company policy to destroy the home office file when a claim is closed, and the only items not still available in the field office file were his notes regarding discussions he had with his superiors regarding the Ellweins' claim. Solito, however, admitted that he understood there "was a chance, not a likelihood[ ]" the case would be re-filed. CP at 351.
In total, two trials were scheduled for the Ellweins' bad faith action. In the first trial, held in August 1995, the Ellweins asserted that Hartford acted in bad faith by: (1) forcing the Ellweins into arbitration to recover insurance benefits; (2) failing to make a reasonable settlement offer; and (3) bringing a summary judgment motion before the arbitrators without reasonable justification.
During this trial, attorney Dwayne Richards testified as an expert witness on the Ellweins' behalf. Richards stated that, in his opinion, Hartford treated the Ellweins unfairly in handling their claim-putting its financial interests before those of its insured. Richards further testified that Hartford unfairly forced the Ellweins into arbitration when it had all the information necessary to resolve the claim by November 1992. Richards also opined that, while Hartford correctly evaluated the value of the case, it "did everything [it] could to avoid paying that amount and basically wanted to gamble on a verdict that hopefully [it] would get a windfall to the detriment of their own insured." CP at 319. Finally, Richards testified that Hartford acted improperly regarding Cooper by attempting "to do everything they [could]" to change Cooper's opinion. CP at 332.
At the close of trial, the Ellweins requested a spoliation instruction based on Solito's file destruction. The Ellweins' request was denied, and the first trial resulted in a hung jury.
On retrial, the Ellweins made substantial changes to their liability theories. In addition to their previous allegations regarding Hartford's low settlement offers, and the propriety of bringing a summary judgment motion before the arbitrators, the Ellweins asserted that Hartford acted in bad faith by: (1) "misappropriating" Cooper as its accident reconstruction expert; (2) misleading the Ellweins' attorney regarding the UIM policy limits; and (3) refusing to provide the Ellweins with recorded witness statements taken by Hartford after the accident. On *644 Hartford's subsequent summary judgment motions, the trial court dismissed all of the Ellweins' bad faith claims against Hartford.

II. Summary of Issues
A. Did Hartford act in bad faith by basing its settlement offers on 50 percent comparative fault?
B. Did Hartford act in bad faith by using accident reconstruction expert Cooper to its advantage after originally hiring Cooper to defend the Ellweins?
C. Did Hartford commit bad faith by misrepresenting to the Ellweins' attorney that the policy limits were $100,000, instead of $1,000,000?
D. Was the jury entitled to infer that the notes Solito destroyed contained unfavorable evidence toward Hartford?

III. Analysis
A. Bad Faith Settlement Offers
In reaching its decision on whether Hartford committed bad faith by asserting a contributory negligence defense, and by making correspondingly low settlement offers, the Court of Appeals quoted Keller v. Allstate Insurance Co., 81 Wash.App. 624, 633, 915 P.2d 1140 (1996):
"The fact that the insurer is ultimately unsuccessful in its policy defense does not render the insurer liable for bad faith refusal to settle claims provided that the insurers['] actions were reasonable, and the insurer had probable cause to pursue its defense. Therefore, the insurer should not be held liable for extra-contractual damages where there is a legitimate controversy as to whether benefits are due or the amount of such benefits...."
Ellwein v. Hartford Accident & Indem. Co., 95 Wash.App. 419, 425, 976 P.2d 138 (1999). The court went on to state: "Our inquiry thus focuses on whether, as a matter of law, Hartford was reasonably justified in its actions defending Ellwein's UIM claim." Id. After conducting that inquiry, the court found that, given the conflicting evidence regarding the color of the lights at the time of the accident, and Mrs. Ellwein's status as the disfavored driver, Hartford's settlement practices were "not unreasonable" and, thus, Hartford did not commit bad faith. Id. at 427, 976 P.2d 138.
The Ellweins assert that the Court of Appeals' decision is based on the misguided premise that the existence of disputed facts regarding a bad faith claim mandate, rather than prevent, summary judgment. The Ellweins assert that the evidence raised a serious question as to whether Hartford's contributory negligence assessment was reasonable, pointing to: (1) Hartford's pre- and post-UIM claim letters to Safeco in which it asserted that Mrs. Ellwein was not at fault; (2) Hartford's internal memorandum where it recognized the weaknesses of Cooper's testimony; and (3) Solito's destruction of file notes. Under the Ellweins' theory, summary judgment regarding Hartford's bad faith settlement offers should have been denied. We disagree.
Appellate review of summary judgment dismissal is de novo. E.g., Stuart v. Am. States Ins. Co., 134 Wash.2d 814, 818, 953 P.2d 462 (1998). Under that standard, this court must determine whether, after reviewing all relevant pleadings and affidavits in favor of the nonmoving party, any genuine issue of material fact exists that prevents the moving party from being entitled to judgment as a matter of law. E.g., Stuart, 134 Wash.2d at 818, 953 P.2d 462 (citing CR 56(c)). When the summary judgment standard is applied in light of the unique and narrow nature of bad faith claims, we are convinced that the Court of Appeals was correct.
RCW 48.01.030 imposes a duty to act in good faith upon insurers, and violation of that duty may give rise to a tort action for bad faith. See, e.g., Indus. Indem. Co. of N.W., Inc. v. Kallevig, 114 Wash.2d 907, 917, 792 P.2d 520 (1990). Claims of bad faith, however, are not easy to establish; insureds must meet a "heavy burden." Nat'l Sav. Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala.1982). Insureds must prove bad faith as a matter of law. "Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim *645 and, thus, the legitimacy of the denial thereof, the tort claim must fail...." Id.; see also Kirk v. Mt. Airy Ins. Co., 134 Wash.2d 558, 560, 951 P.2d 1124 (1998) (citing case) (to establish tort of bad faith, insured must show insurer's settlement actions were "unreasonable, frivolous, or unfounded"); Kallevig, 114 Wash.2d at 917, 792 P.2d 520 (insurers generally not guilty of bad faith if they have a "reasonable justification" for their actions) (citing cases).
Applying the bad faith standard in the summary judgment context, an insurer is ordinarily entitled to summary judgment dismissal of a bad faith claim unless the insured shows there was no reasonable basis for the insurer's actions. Stated another way, where there is no real dispute that an insurer had a reasonable basis for its actions, dismissal of the bad faith claim on summary judgment is appropriate. See Keller v. Allstate Ins. Co., 81 Wash.App. 624, 633, 915 P.2d 1140 (1996) (insurer not guilty of bad faith if "`legitimate controversy'" as to benefits due (quoting 15A GEORGE J. COUCH, COUCH ON INSURANCE § 58:1 (Ronald A. Anderson & Mark S. Rhodes, 2d rev. ed.1983))); Pruitt v. Alaska Pac. Assurance Co., 28 Wash.App. 802, 804, 626 P.2d 528 (1981) ("bona fide dispute" over existence and extent of damage precluded bad faith claim).
This "fairly debatable" standard for determining bad faith, as it is commonly called, is followed in the vast majority of jurisdictions.[7] The logic of putting insureds to task in bad faith cases has been described as follows:
An insurer is entitled to dispute claims so long as it has a reasonable basis. If reasonable minds could not differ on the coverage-determining facts, a verdict should be directed or summary judgment rendered on coverage. If that cannot be done, it ordinarily must follow that the insurer had reasonable grounds to dispute the facts, precluding any possibility of bad faith.
William T. Barker & Paul E.B. Glad, Use of Summary Judgment in Defense of Bad Faith Actions Involving First Party Insurance, 30 TORT & INS. L.J. 49, 56 (1994); see also Douglas G. Houser, Good Faith as a Matter of Law: The Insurance Company's Right to Be Wrong, 27 TORT & INS. L.J. 665-70 (1992).[8]
Applying this standard, we completely concur with the Court of Appeals' finding that dismissal of the bad faith claim regarding *646 Hartford's settlement practices was warranted. As the court noted, it is undisputed that Hartford, as a UIM insurer, had a general right to assert a comparative fault defense. Furthermore, the ambiguous and somewhat conflicting eyewitness reports alone created an issue as to whether Gleason entered the light on the yellow. Had Gleason entered the light on the yellow, Mrs. Ellwein would have been at least partially responsible for the accident by breaching in her statutory duty to yield. See RCW 46.61.185 (duty to yield imposed upon driver turning left at intersection). Consequently, even absent Cooper's revised report, this claim of bad faith was properly dismissed because of Hartford's legitimate basis for asserting comparative fault.
B. "Misappropriation" of an Expert Witness
The Ellweins assert that, by continuing to use accident reconstruction expert Cooper as its own witness after the UIM claim was made, Hartford violated its duty of good faith.
Hartford refutes this claim, arguing that Cooper was its witness because it retained him on its own behalf. Under Hartford's theory, as a UIM insurer, it "stood in the shoes" of the underinsured motorist and, thus, was under no obligation that would have prevented it from utilizing Cooper's services in defending against the UIM claim.[9] While we agree that insurers' duties differ in the UIM context, we nevertheless find that Hartford acted in bad faith with respect to Cooper.
The real issue in this case is: what is the nature of a UIM insurer's duty of good faith toward its insured? Or, more specifically, does a UIM insurer violate its duty of good faith by hiring an expert for its insured to aid in the insured's liability representation, and then retaining that expert to aid in its defense of an insured's UIM claim? In addressing this issue, we (1) compare the nature of the reservation of rights context and the UIM context to determine the applicable duty of good faith and (2) apply that duty to the facts of this case.
When an insurer defends its insured under a "reservation of rights," an insurer is nearly a fiduciary of the insured. Safeco Ins. Co. of Am. v. Butler, 118 Wash.2d 383, 389-90, 823 P.2d 499 (1992); Tank v. State Farm Fire & Cas. Co., 105 Wash.2d 381, 385-86, 715 P.2d 1133 (1986) (citing case). While the insurer does not have to place the insured's interests above its own, it is required:
to give "equal consideration" to the insured's interests. Thus, an insurance company's duty of good faith rises to an even higher level than that of honesty and lawfulness of purpose toward its policyholders: an insurer must deal fairly with an insured, giving equal consideration in all matters to the insured's interests.
Tank, 105 Wash.2d at 385-86, 715 P.2d 1133 (citation omitted).
The Tank court, at page 388, went on to list four specific criteria to meet this "enhanced obligation":
First, the company must thoroughly investigate the cause of the insured's accident and the nature and severity of the plaintiff's injuries. Second, it must retain competent defense counsel for the insured. Both retained defense counsel and the insurer must understand that only the insured is the client. Third, the company has the responsibility for fully informing the insured not only of the reservation of rights defense itself, but of all developments relevant to his policy coverage and the progress of his lawsuit. Information regarding progress of the lawsuit includes *647 disclosure of all settlement offers made by the company. Finally, an insurance company must refrain from engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk.
On the other hand, the relationship between a UIM insurer and its insured "is by nature adversarial and at arm's length." Fisher v. Allstate Ins. Co., 136 Wash.2d 240, 249, 961 P.2d 350 (1998). UIM insurance provides an excess layer of coverage that is designed to provide full compensation for all amounts that a claimant is legally entitled to where the tortfeasor is underinsured. Allstate Ins. Co. v. Dejbod, 63 Wash.App. 278, 281, 818 P.2d 608 (1991). "Legally entitled to" is the operative phrase, as a UIM insurer "stands in the shoes" of the tortfeasor, and its liability to the insured is identical to the underinsured tortfeasor's, up to the UIM policy limits. Dayton v. Farmers Ins. Group, 124 Wash.2d 277, 281, 876 P.2d 896 (1994); see also Dejbod, 63 Wash.App. at 281-82, 818 P.2d 608. Stated otherwise, UIM insurers are allowed to assert liability defenses available to the tortfeasor because UIM insurance is designed to
place the insured in the same position as if the tortfeasor carried liability insurance.... The injured party is not entitled to be put in a better position by having been struck by an uninsured motorist as opposed to an insured motorist.
Dayton, 124 Wash.2d at 281, 876 P.2d 896.
As is evident from the above, Tank's "enhanced obligation" rule is simply unworkable in the UIM context. How could a UIM insurer "stand in the shoes" of the tortfeasor, with the ability to assert liability defenses, while at the same time give "equal consideration" to the insured's interest? UIM coverage requires that a UIM insurer be free to be adversarial within the confines of the normal rules of procedure and ethics. To require otherwise would contradict the very nature of UIM coverage.
Having found that an "enhanced" duty does not exist does not mean, however, that the duty of good faith simply disappears after a UIM claim is made. Many other courts have held, as we do today, that the duty of good faith and fair dealing survives within the UIM relationship. This is because, although the relationship becomes adversarial, the insured still has "the `reasonable expectation' that he will be dealt with fairly and in good faith by his insurer...." Craft v. Economy Fire & Cas. Co., 572 F.2d 565, 568-69 (7th Cir.1978); accord Tait v. Royal Ins. Co., 913 F.Supp. 621 (D.Me.1996); Hendren v. Allstate Ins. Co., 100 N.M. 506, 672 P.2d 1137, 1140-41 (Ct.App.1983); MFA Mut. Ins. Co. v. Flint, 574 S.W.2d 718, 720-21 (Tenn.1978); Palmer v. Farmers Ins. Exch., 261 Mont. 91, 861 P.2d 895, 913 (1993); State Farm Mut. Auto. Ins. Co. v. Canady, 197 W.Va. 107, 475 S.E.2d 107, 115 (1996). Taking a cue from the Court of Appeals of New Mexico:
The rule we adopt does not mean that the insurer is precluded from defending the uninsured motorist or from evaluating the claim any differently than it would have had it provided third party coverage. What it does mean, however, ... is that the insurer must deal in good faith and fairly as to the terms of the policy and not overreach the insured, despite its adversary interest.
Hendren, 672 P.2d at 1141.[10]
Applying this basic standard of good faith, we find that Hartford committed bad faith as a matter of law. First, we find Hartford's claim that it believed Cooper was its expert disingenuous. Hartford clearly understood Cooper to be the Ellweins' expert, and intended to manipulate his conclusions, *648 as is evidenced by its apparent satisfaction in having been able "to get their reconstruction expert to reevaluate his position." CP at 165 (emphasis added).
Second, although no previous Washington case is precisely on point regarding experts, a rule prohibiting the use and manipulation of the insured's expert by the insurer can be easily extrapolated from the analogous rule dealing with attorneys. Under Tank, it is presumed that insurers understand that an attorney hired by the insurer to defend the insured has only the insured for a client. Tank, 105 Wash.2d at 388, 715 P.2d 1133. We see no reason to treat an expert hired under similar circumstances differently. Both are hired to support the insured's defense. Both are hired at a time when the insurer clearly owes the insured a duty to not self-deal. Consequently, Hartford can not avoid the claim of bad faith based on "the presence of a res nova question of law...." Guitreau v. State Farm Mut. Auto. Ins. Co., 540 So.2d 1097, 1102 (La.Ct.App.1989) ("[W]here sufficient jurisprudence exists to give guidance to insurance companies in determining whether a claim should be denied, the risk of erroneous interpretation falls on the insurer."). Accord Shepherd v. State Auto Prop. & Cas. Ins. Co., 312 Ark. 502, 850 S.W.2d 324, 330 (1993); Patterson v. Nationwide Mut. Ins. Co., 358 Pa.Super. 167, 516 A.2d 1235, 1240 (1986).
Finally, we find it particularly troubling that the insurer may "commingle" the liability representation file with the UIM file in such a way.[11] If the insurer truly "stands in the shoes" of the tortfeasor, the benefits of the adversarial relationship should be accompanied by its costs. UIM insurers should be prohibited from using or manipulating an expert where it would be unable to do so if it were, in fact, the tortfeasor.[12]
Having found that Hartford committed bad faith as a matter of law by misappropriating the Ellweins' expert, we reverse the Court of Appeals' dismissal of this claim. Furthermore, in the name of judicial economy, we remand for the entry of summary judgment for the Ellweins on this claim and for a determination of damages.[13]
C. Alleged Bad Faith Misrepresentation of Policy Limits
The Ellweins further claim that Hartford committed bad faith by misleading their attorney regarding the UIM policy limits. However, the sum total of the Ellweins' evidence of the misrepresentation is their attorney's bare assertion that Hartford misled him. The Ellweins fail to provide any context for this alleged misrepresentation, nor any evidence that the Ellweins were denied access to the policy, which clearly stated the UIM policy limits. Consequently, this unsupported allegation of misrepresentation was properly dismissed. See Trimble v. Wash. State Univ., 140 Wash.2d 88, 93, 993 P.2d 259 (2000) (bare assertions will not defeat summary judgment motion).
D. Spoliation Instruction
The final issue raised in the Ellweins' petition for review is whether the jury should have been allowed to infer that Solito's destruction of the home office file "concealed unreasonable and bad faith activity" by Hartford. Br. of Appellant at 34. More specifically, the Ellweins argue that the trial court erred in failing to give a spoliation of evidence instruction similar to the following:

*649 "If defendant failed to produce evidence which is under its control and reasonably available to it and not reasonably available to plaintiff, then you may infer that the evidence is unfavorable to the defendant who could not have produced it and did not."
Br. of Appellant at 33 (citation omitted).
However, because liability is no longer a question, and the only issue that remains is damages, such an instruction is not necessary. See McLain v. Taco Bell Corp., 137 N.C.App. 179, 527 S.E.2d 712, 720 (2000).[14] Consequently, we decline to address this issue. See, e.g., Hayden v. Mut. of Enumclaw Ins. Co., 141 Wash.2d 55, 68, 1 P.3d 1167 (2000) (principles of judicial restraint dictate that courts should avoid resolving issues unnecessary to the resolution of the case).

IV. Conclusion
In sum, we affirm the trial court's dismissal of the misrepresentation and low settlement offer bad faith claims. However, having found that Hartford committed bad faith by "misappropriating" the Ellweins' accident reconstruction expert, we reverse the trial court's dismissal of that count and remand for a determination of damages.
ALEXANDER, C.J., SMITH, JOHNSON, MADSEN, SANDERS, BRIDGE, JJ., TALMADGE, J. Pro Tem., and GUY, J. Pro Tem., concur.
NOTES
[1] Ellwein suffered permanent injuries that affected her brain function and vision. Clerk's Paper's (CP) at 140-41, 233, 673.
[2] Cooper's analysis was based on the assumption that the traffic lights for both Gleason and Mrs. Ellwein changed colors at the same time.
[3] After the Ellweins filed their UIM claim, and despite the previously expressed concerns regarding comparative fault, Hartford wrote another letter to Safeco that reiterated its view that the "responsible party is in fact the driver insured with Allstate [Gleason]." CP at 135.
[4] CP at 266 (in his declaration, Woodley asserted that "Hartford told me that UIM limits were $100,000.").
[5] CP at 533 (letter states, "As a matter of clarification, the policy limits available for [UIM] benefits is $1,000,000.").
[6] Except for the last two declarations, all of these documents predated Cooper's original report.
[7] See generally Douglas G. Houser, Good Faith as a Matter of Law: The Insurance Company's Right to Be Wrong, 27 TORT & INS. L.J. 665, 669 (1992) (36 states follow a "fairly debatable"-type standard for bad faith claims). The following are samples of those jurisdictions: Tait v. Royal Ins. Co., 913 F.Supp. 621, 626-28 (D.Me.1996) (bad faith claim against UIM insurer defeated where insurer establishes "reasonable basis" for its action); Becker v. Am. Family Ins. Group, 697 N.E.2d 106, 108 (Ind.Ct.App.1998) (summary judgment dismissal of bad faith claim upheld where insurer had "a rational basis" for its actions); Ahrenholtz v. Time Ins. Co., 968 P.2d 946, 950-51 (Wyo.1998) (bad faith claim dismissed on summary judgment because court found "simply no question ... Plaintiffs' claim was `fairly debatable[]'"); Dirks v. Farm Bureau Mut. Ins. Co., 465 N.W.2d 857, 861-62 (Iowa 1991) (no bad faith where validity of insurance claim was "fairly debatable"); Rumford Prop. & Liab. Ins. Co. v. Carbone, 590 A.2d 398, 400-01 (R.I. 1991) ("debatable issue of fact" regarding coverage should have prevented bad faith issue from reaching jury); Stevenson v. Union Std. Ins. Co., 294 Ark. 651, 746 S.W.2d 39, 41-42 (1988) (existence of "legitimate dispute" warranted summary judgment on bad faith claim); Bryant v. Fed. Kemper Ins. Co., 542 A.2d 347, 352 (Del.Super.Ct.1988) (insured asserting bad faith claim must demonstrate insurer "was clearly without any reasonable justification" for its action); Blue Cross & Blue Shield of Miss., Inc. v. Campbell, 466 So.2d 833, 841 (Miss. 1984) (trial court serves as gatekeeper in bad faith cases; if court finds insurer had "a reasonably arguable basis, either in fact or in law," for its actions, the issue of bad faith should not go to the jury); Dutton, 419 So.2d at 1362 ("[T]o make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law.").
[8] Houser, at 667, 670, states:

[The "fairly debatable" standard] is a simple matter of fairness. All persons, including insurance companies, should have the right to their day in court. The price of losing a trial should not be millions of dollars in punitive damages.
. . . .
[The] national trend permitting dismissal of bad faith claims as a matter of law coincides with an increased willingness on the part of courts to use summary judgment as a means of curtailing the "unwarranted consumption of public and private resources."
[9] Alternatively, Hartford asserts that the Ellweins' failure to raise this issue for over a decade amounts to waiver. The only case Hartford cites is First Small Business Investment Co. v. Intercapital Investment Corp., 108 Wash.2d 324, 337, 738 P.2d 263 (1987). That case, however, is completely distinguishable. Small Business involved a party's failure to seek disqualification of counsel in a timely fashion and, thus, involved issues of fairness and delay simply not present here. See 108 Wash.2d at 337, 738 P.2d 263. Consequently, because Hartford has failed to cite any controlling authority to support its argument, we find that its waiver claim should fail. See State v. Hoffman, 116 Wash.2d 51, 71, 804 P.2d 577 (1991) ("Arguments not supported by relevant citation of authority need not be considered by this court.").
[10] We emphasize that, for the reasons stated herein, we do not go so far as some of these opinions and impose an "enhanced" duty of good faith upon UIM insurers. See, e.g., Tait, 913 F.Supp. at 625 ("`[T]he standard by which the conduct of insurers is judged ... should be higher for uninsured motorist claims than it is for first party insurance coverages....'" (quoting State Farm Mut. Auto. Ins. Co. v. Shrader, 882 P.2d 813, 826 (Wyo.1994))). Consequently, we disapprove of prior Washington decisions that have suggested that we do. See Escalante v. Sentry Ins., 49 Wash.App. 375, 385, n. 7, 743 P.2d 832, 838 n. 7, (1987) (quoting, in what appears to be dicta, 2A ALAN I. WIDISS, UNINSURED AND UNDERINSURED MOTORIST INSURANCE § 20.3 (2d ed.1987)).
[11] Cf. Lima v. Chambers, 657 P.2d 279, 285 (Utah 1982) (Intervening insurer in tort action "must not be allowed to use against its insured any information whatsoever gained by reason of the insurer-insured relationship.") (citing case).
[12] Both parties rely on Johnson v. McCay, 77 Wash.App. 603, 893 P.2d 641 (1995), to support their respective arguments that Cooper was their expert. McCay, however, is simply inapposite. The issue in McCay involved discovery rule CR 26(b), and whether the expert physician was retained "in anticipation of litigation." McCay had nothing whatsoever to do with answering the question raised here-to whom the expert "belongs."
[13] See Health Ins. Pool v. Health Care Auth., 129 Wash.2d 504, 919 P.2d 62 (1996) (this court affirmed summary judgment dismissal granted by the trial court sua sponte in favor of the nonmoving party); see also Pub. Sch. Employees v. Crowe, 88 Wash.App. 161, 943 P.2d 1164 (1997) (court reversed summary judgment and remanded for summary judgment in favor of the nonmoving party).
[14] In McLain, the court found that, while the trial court's failure to provide spoliation instruction required reversal and retrial on claims where issues of liability existed, reversal was not similarly required for claims where only issues of damages remained. 527 S.E.2d at 720; see also Marshall v. Bally's Pacwest, Inc., 94 Wash.App. 372, 381, 972 P.2d 475 (1999) ("To remedy spoliation the court may apply a rebuttable presumption, which shifts the burden of proof to a party who destroys or alters important evidence." (emphasis added)) (citing case); Jeffrey S. Kinsler & Anne R. Keyes Maclver, Demystifying Spoliation of Evidence, 34 TORT & INS.L.J. 761, 775 ("In its strictest form, the `spoliation inference' establishes prima facie the elements of the injured party's claim that cannot be proven without the missing evidence.").