[Nos. 57068-4-I; 56625-3-I.   Division One.   April 23, 2007.]

MICHAEL STEPHENS, *on Behalf of Himself and All Others Similarly Situated, Respondent*, v. OMNI INSURANCE COMPANY ET AL., *Petitioners*.

RAJVIR PANAG, *on Behalf of Herself and All Others Similarly Situated, Respondent*, v. FARMERS INSURANCE COMPANY OF WASHINGTON ET AL., *Appellants*.

156

*E. Pennock Gheen III, Charles A. Willmes*, and *Jerret E. Sale* (of *Bullivant Houser Bailey, PC*) and *Shawnmarie Stanton* (of *Safeco Insurance Company*), for petitioner Omni Insurance Company.

*Clarence C. Jones* (of *Gierke, Curwen, Metzler & Erie, PS*) and *Melissa O'Loughlin White* (of *Cozen O'Connor*), for petitioner/appellant Credit Control Services, Inc.

*Stevan D. Phillips, Margarita V. Latsinova*, and *Deirdre L. Runnette* (of *Stoel Rives, LLP*), for appellant Farmers Insurance Company of Washington.

*Matthew J. Ide* (of *Ide Law Offices*) and *Murray T. Stakesby Lewis*, for respondents.

¶1 BECKER, J. — At issue here is a credit collection agency's practice of sending aggressive notices on behalf of insurance companies in an attempt to recover subrogation interests from uninsured drivers. In each of these linked cases, notices styled as "formal collection notices" demanded immediate payment of an "amount due." We conclude the notices are deceptive and hold that the practice of sending them violates the Consumer Protection Act, chapter 19.86 RCW.

## FACTS

¶2 These two appeals have been linked for consideration because the core issue is the same. Credit Control Services, Inc. (d/b/a Credit Collection Services) was a defendant in

each case below, and the focus of each appeal is the notices sent by Credit to the plaintiffs. Counsel for the plaintiffs is the same in each case.

### Stephens

¶3 In the first case, Michael Stephens (respondent on appeal) was the plaintiff below. Stephens rear-ended Carrine York's vehicle on June 9, 2003. The damage to her car was appraised at $544.09. York had underinsured motorist coverage with Omni Insurance Company. Omni subtracted the deductible of $100 and sent York a check for $444.09.[1]

¶4 Omni sent several letters to Stephens on August 5, 2003, asking him to get in touch with an Omni representative. One letter said, "We have been notified of the captioned loss. In order to properly investigate the accident, it is important that I obtain your version of what happened." Another stated, "The investigation to date indicates that we may look to you for repayment of our insured's damages. . . . If you do not have insurance to protect you for this accident, we advise you to contact us within 30 days . . . . Your failure to respond within 30 days may result in a judgment against you and the suspension of your driving privileges."[2] Stephens did not respond to these letters.

¶5 Omni sent two similar letters to Stephens on October 10, 2003. The first letter stated that York had been paid $444.09 for damage to her car and that Omni claimed a right to reimbursement from Stephens:

> Our investigation into our insured's loss has determined that your auto was at fault for this accident, and under the terms of our policy we are making a claim against you for reimbursement of the amount we paid.
>
> . . . If you do not have insurance for this accident, please contact the undersigned as soon as possible so that arrangements can be made to amicably settle this matter in a manner

---

[1] Clerk's Papers at 212.

[2] Clerk's Papers at 208, 210.

agreeable to all parties and to avoid any unnecessary legal action.

You have a right to dispute any or all of our claims. If you do not dispute it within 30 days of receiving this letter, Omni Automobile will assume that it is valid. You have a right to receive a copy of the repair estimate, a copy of the check that Omni Automobile paid to its insured, or to the repairer of the auto and copies of any or all other documents that verify the existence of our rights of subrogation.[3]

The second letter reiterated that Omni was looking to Stephens for full reimbursement: "Since our investigation reveals that you are uninsured for this loss, we seek full reimbursement directly from you for all payments we have made in this matter."[4] Stephens—who was not sure about his insurance coverage—responded to these letters by sending Omni his own check for $444.09.

¶6 Six months passed. Omni made two more payments to York: $5,112 for medical expenses and $1,300 for bodily injury. Omni did not contact Stephens about these payments. Omni instead arranged to have its subrogation claim pursued by Credit Control Services, Inc., a Delaware corporation licensed to collect debt in Washington.[5] The notices sent by Credit constitute the practice alleged to be deceptive.

¶7 Credit began by sending a "formal collection notice" to Stephens on April 16, 2004. The notice specified $6,412.00 as the "amount due":[6]

---

[3] Clerk's Papers at 212.

[4] Clerk's Papers at 214.

[5] Clerk's Papers at 21.

[6] Clerk's Papers at 74.

**SUBROGATION CLAIM**

| REGARDING: | AMOUNT DUE: |
|---|---|
| OMNI INSURANCE | $6,412.00 |

**THIS IS A FORMAL COLLECTION NOTICE**

You were involved in an incident which resulted in the above referenced damages being paid by our client. Please be advised that the amount reflected on this notice is an amount already incurred, and any further damages paid as a result of this incident will be added to this amount. Should this occur, you will be so advised.

Unless you can provide this office with evidence of <u>insurance coverage</u> that existed on the date of loss, our client will consider you financially responsible.

To avoid the possibility of legal action and/or license suspension (contingent upon applicable state law), you can make instant payment by check or credit card through our 24-hour toll-free touch tone service or by accessing our website @ <u>www.ccspayment.com</u>.

¶8 Stephens called Credit twice upon receiving this notice. "I did not understand how I could owe such a debt or why it was in 'collection.' "[7] Credit's telephone representatives told Stephens the notice represented amounts paid by Omni to York as a result of the accident. According to Stephens, one representative told him Credit had him in "collection" and "had the power to get money from me in a variety of different ways from whatever financial resources I had."[8] Credit's notes reflect that Stephens "stated that he did not feel that he owed the balance stated in the letter."[9]

¶9 Credit sent Stephens a similar notice three weeks later. This second notice dated May 7, 2004 declared in

---

[7] Clerk's Papers at 68.

[8] Clerk's Papers at 69.

[9] Clerk's Papers at 386.

large print: "ACTIVITY PENDING TEN (10) DAYS." The notice said: "You have failed to respond to our notice requesting full payment -or- evidence of insurance coverage that existed on the date-of-loss." The notice threatened consequences potentially including litigation and license suspension unless Stephens acted "immediately":

> This office has been authorized to pursue full payment in accordance with both federal and state law(s) which could result in a law suit being filed against you and/or license suspension (contingent upon applicable state law). Be advised, state law requires that financial responsibility be maintained continuously throughout the registration period of your vehicle.
>
> Act immediately, as your file is pending further action.[10]

¶10 Soon after Stephens received the second notice, he wrote to Credit, stating that he disputed the charges. He requested proof of payment showing the alleged amount due. Stephens also contacted his insurance company, GEICO. GEICO contacted Credit on May 19, 2004 to let them know that Stephens was insured on the loss. Thereafter Credit sent no more letters to Stephens.

¶11 Meanwhile, concerned that his credit rating was in jeopardy, Stephens consulted an attorney.[11] Stephens sued Omni and Credit in June 2004 for violating the Consumer Protection Act. He moved for summary judgment against both defendants. The court granted the motion as to liability and reserved ruling on the amount of damages. Appeal by Omni and Credit of the summary judgment ruling on liability is before this court on discretionary review.

### Panag

¶12 In the second case, Rajvir Panag (respondent on appeal) was the plaintiff below. Panag was injured in a two-car accident with Deven Hamilton on October 5, 2003.

---

[10] Clerk's Papers at 77.

[11] Clerk's Papers at 69.

Panag was uninsured. Hamilton's insurer, Farmers Insurance Company, investigated and concluded that Panag was 40 percent at fault. Farmers paid Hamilton $6,102.53 for property damage. There was a $340 deductible. One month later, Panag received from Credit a "formal collection notice" on behalf of Farmers specifying the "amount due" as $6,442.53:[12]

|  | SUBROGATION CLAIM |
| --- | --- |
| REGARDING: | AMOUNT DUE: |
| FARMERS INSURANCE | $6,442.53 |

### THIS IS A FORMAL COLLECTION NOTICE

You were involved in an incident which resulted in the above referenced damages being paid by our client. Please be advised that the amount reflected on this notice is an amount already incurred, and any further damages paid as a result of this incident will be added to this amount. Should this occur, you will be so advised.

Unless you can provide this office with evidence of insurance coverage that existed on the date of loss, our client will consider you financially responsible.

To avoid the possibility of legal action and/or license suspension (contingent upon applicable state law), you can make instant payment by check or credit card through our 24-hour toll-free touch tone service or by accessing our website @ www.ccspayment.com.

A representative from Farmers later admitted that the purported "amount due" was a "mistake," as it should have been adjusted to reflect that Farmers' determination of Panag's liability was 40 percent.[13]

¶13 Three weeks later, Credit sent another notice of "Subrogation Claim Regarding: Farmers Insurance," this

---

[12] Clerk's Papers at 168.

[13] Clerk's Papers at 600.

one enclosed in a black border containing in large font the words, "ATTENTION – ATTENTION – ATTENTION – ATTENTION – Enclose Bottom Portion with Your Payment." Again, the notice set forth $6,442.53 as the "AMOUNT DUE." It declared in larger print: "ACTIVITY PENDING TEN (10) DAYS" and then stated, "You have failed to respond to our notice requesting full payment -or-evidence of insurance coverage that existed on the date-of-loss."[14] The notice demanded immediate action to avoid litigation and license suspension:

> This office has been authorized to pursue full payment in accordance with both federal and state law(s) which could result in a law suit being filed against you and/or license suspension (contingent upon applicable state law). Be advised, state law requires that financial responsibility be maintained continuously throughout the registration period of your vehicle.
>
> Act immediately, as your file is pending further action.[15]

¶14 Credit sent Panag a third notice on December 22, 2003. The words "Western Union" were printed at the top, although the record does not indicate the notice was sent as a telegram. This notice threatened additional consequences for Panag should she fail to pay the "amount due" of $6,442.53:

> IF CREDIT COLLECTION SERVICES CANNOT EFFECT RECOVERY, A REPORT WILL BE SENT TO OUR CLIENT STATING "VOLUNTARY COLLECTION DEEMED IMPOSSIBLE".
>
> FURTHER OPTIONS INCLUDE:
>
> 1) PERFORMING AN ASSET SEARCH IN AN EFFORT TO PROTECT OUR CLIENT'S LEGAL INTERESTS IN THIS MATTER.
>
> 2) LITIGATION – WHICH COULD INCLUDE INTEREST, COURT COSTS AND SHERIFF FEES.
>
> 3) NOTIFY THE DEPARTMENT OF MOTOR VEHICLES OF YOUR APPARENT FAILURE TO COMPLY WITH THE FINAN-

---

[14] Clerk's Papers at 170.

[15] Clerk's Papers at 170.

CIAL RESPONSIBILITY LAW, WHICH CAN LEAD TO LI-
CENSE SUSPENSION (CONTINGENT UPON APPLICABLE
STATE LAW) UNDER THE RULES AND REGULATIONS GOV-
ERNED BY STATUTE.

4) PURSUE COLLECTION THROUGH ANY OTHER METHOD
PERMITTED UNDER STATE OR FEDERAL LAW.

. . . .

*********TO ENSURE PROPER CREDIT, D-E-T-A-C-H THE
BOTTOM PORTION OF THIS NOTICE WITH YOUR PAY-
MENT TO: *********

C.C.S.

PAYMENT PROCESSING CENTER

[Address in Boston, Massachusetts][16]

¶15 Panag was "scared" because she "wasn't sure what the debt was about and what they were trying to collect and the amount."[17] She contacted the attorney who was already representing her in connection with her own personal injury claim arising from the accident. In May 2004, she filed a class action complaint alleging that Farmers and Credit had violated the Consumer Protection Act. Farmers and Credit both moved for summary judgment. The court granted their motions. The court concluded that although the notices were deceptive, Panag did not suffer an injury. She had not actually made payment in response to the notice, she had not shown that her credit was actually affected, and the minimal expense of contacting her attorney about the notices was insignificant because "she was already seeing an attorney" in connection with the accident.[18] The court determined, however, that even after the entry of a final judgment of dismissal as to Panag's claim, counsel for Panag should be given additional time to discover whether other persons who had received similar notices were interested in joining the action. Farmers and Credit appeal the ruling granting additional time to dis-

---

[16] Clerk's Papers at 171.

[17] Clerk's Papers at 711.

[18] Clerk's Papers at 320-25, Ct.'s Oral Ruling (June 10, 2005).

cover other potential plaintiffs. Panag cross-appeals the decision to dismiss her case on summary judgment.

## CONSUMER PROTECTION ACT

■ ¶16 The Consumer Protection Act declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. A private plaintiff must prove five elements: (1) unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) public interest impact, (4) injury to plaintiff in his or her business or property, and (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986). These appeals put all five elements at issue.

■ ¶17 Summary judgment is proper only when pleadings, depositions, admissions, and affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. On review, we engage in the same inquiry as the trial court. We consider facts in the light most favorable to the nonmoving party. Review is de novo. CR 56(c); *Fid. Mortgage Corp. v. Seattle Times Co.*, 131 Wn. App. 462, 467, 128 P.3d 621 (2005).

### *Deceptive Act*

■ ■ ¶18 The act does not define the term "deceptive," but implicit in that term is "the understanding that the actor *misrepresented* something of material importance." *Hiner v. Bridgestone/Firestone, Inc.*, 91 Wn. App. 722, 730, 959 P.2d 1158 (1998), *rev'd on other grounds*, 138 Wn.2d 248, 978 P.2d 505 (1999). To prove that a practice is deceptive, neither intent to deceive nor actual deception is required. The question is whether the conduct has the capacity to deceive a substantial portion of the public. *Hangman Ridge*, 105 Wn.2d at 785-86. Whether particular actions are deceptive is reviewable as a question of law. *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 150, 930 P.2d 288 (1997).

¶19 The plaintiffs contend Credit's notices have the capacity to deceive because they look like debt collection

notices and the uninsured drivers who receive them may be misled into paying the "amount due" as if it were based on a debt they actually owed rather than a tort claim. The defendants respond that the notices are not deceptive because the information conveyed is accurate: the insurance companies had valid subrogation claims based on sums paid to their insureds.

¶20 A defendant need not affirmatively state an untrue fact to have committed a deceptive practice. For example, the practice of including miscellaneous service charges such as fax fees on a mortgage payoff statement has the capacity to deceive because it creates the misleading appearance that the mortgage cannot be released unless the miscellaneous charges (unrelated to the mortgage) are paid. *Dwyer v. J.I. Kislak Mortgage Corp.*, 103 Wn. App. 542, 547, 13 P.3d 240 (2000). A closing agent's employment of a nonattorney to prepare closing documents is deceptive where the sellers could have reasonably believed the agents had legal expertise. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 592, 675 P.2d 193 (1983). Threatening debtors with imminent legal action in "Trans-O-Grams," a format designed to resemble telegrams, is deceptive because it misrepresents the urgency of the communication. *Trans World Accounts, Inc. v. Fed. Trade Comm'n*, 594 F.2d 212, 215-16 (9th Cir. 1979).

¶21 The plaintiffs do not allege, and we do not hold, that it is deceptive for a tort claimant or the claimant's agent to correspond with an alleged tortfeasor and demand payment of a specific sum. But when a notice from a credit collection agency arrives with the message that it is a "Formal Collection Notice" for an "amount due," a recipient can reasonably be expected to perceive it as notice of a debt that must be paid. The increasingly urgent tone ("ATTENTION!") and message ("ACTIVITY PENDING TEN (10) days") suggests that the recipient's situation is becoming worse with each passing day, when in fact there is no urgency. The basis of the alleged "amount due" is an unliquidated tort claim, not an unpaid consumer debt. Yet

the notices from Credit do not even explain what the "amount due" is for or how it was calculated. There is no reference to the underlying accident, no supporting documentation, and no suggestion of a right to dispute the claim.

¶22 Credit's notices demand payment for a "subrogation claim"—a technical term not easily understood—in a manner indicating that the driver's obligation to pay is already fixed beyond reasonable dispute and immediate payment is the only reasonable course of action. But when Credit found out that Stephens actually did have insurance through GEICO, Credit sent GEICO "a notice of subrogation" that took a different tone. "[Omni's] investigation indicates that liability rests with your insured. . . . [K]indly advise this office immediately of your position with regard to this claim. All necessary supporting documentation is attached. Thank you in advance for your anticipated cooperation."[19] The letter to GEICO accurately reflects the reality that the demand is based on a one-sided assessment of tort liability. Credit's notice to Stephens about the same claim—"This is a formal collection notice" of an "amount due"—does not reflect that reality. The contrast illuminates the deceptive nature of the notices designed to be sent to uninsured drivers, who are presumably far less sophisticated about the handling of subrogation claims than an insurance company is, and far less aware of the many factual and legal variables that can affect the value of a tort claim and make it open to dispute.

¶23 Panag's case in particular illustrates how characterizing an unliquidated claim as an "amount due" has the capacity to deceive. Although Farmers estimated Panag's comparative fault at 40 percent, the "amount due" demanded by Credit was 100 percent of the damage to the other vehicle. The notice included no information about how

---

[19] Clerk's Papers at 539. Reinforcing the impression of debt collection, the "formal collection notices" were sent under the letterhead of "Credit Collection Services" and bore the seals of two collection agency associations. The notice to GEICO bore no seals and was sent under the letterhead of "The CCS Companies."

the "amount due" was calculated that would have made the recipient aware of this discrepancy.

¶24 Like the mortgage payoff statement in *Dwyer* that included charges unrelated to the mortgage, the escrow practices in *Bowers* that had the patina of legal expertise without the genuine article, and the "Trans-o-Grams" sent by the debt collection agency in *Trans World Accounts*, the notices sent by Credit were materially misleading even though they contained some accurate information. They created an impression of a debt owed and sent to collection, when in reality all the "creditor" had was a tort claim. This was deceptive.

¶25 Our conclusion on this point is not changed by *Camacho v. Automobile Club of Southern California*, 142 Cal. App. 4th 1394, 48 Cal. Rptr. 3d 770 (2006), a case defendants have cited as supplemental authority. The plaintiff in that case complained of a virtually identical practice under California's law against unfair competition. The trial court entered judgment for the defendants and the court of appeals affirmed.

¶26 The issue in *Camacho* was presented by a motion for judgment on the pleadings. The court assumed as factual the plaintiff's allegation that the collection agency had designed notices and threats "to dupe the recipient to pay whatever sums of money" the insurance company and collection agency said were owed. *Camacho*, 142 Cal. App. 4th at 1399. The *Camacho* court nevertheless concluded as a matter of law that the practice was not "unfair" under California's statute. Here, defendants suggest that *Camacho* is persuasive authority on the issue of whether the practice is "deceptive." We disagree.

¶27 The focus of California's statute is "unfair competition." *See Camacho*, 142 Cal. App. 4th at 1399-1400 (discussing section 17200 of California's Business and Professions Code). Our Consumer Protection Act more broadly attacks "unfair *or deceptive* acts or practices in the conduct of any trade or commerce." RCW 19.86.020 (emphasis added). As a result, California's consumer protection juris-

prudence as set forth in *Camacho* is substantially different from *Hangman Ridge*. Whether a deceptive consumer practice is "unfair" is determined by the court using a three-part test borrowed from federal law defining the term: "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." *Camacho*, 142 Cal. App. 4th at 1403. Considering these factors, the court determined the business practice was not unfair. First, because plaintiff Camacho admitted that he was at fault, he was liable for the damages, so he could not be injured by efforts to collect them. Second, even if injury occurred, the desirability of collecting sums actually owed was a countervailing benefit. "The public is well served when an uninsured driver who was at fault responds to his or her obligations." *Camacho*, 142 Cal. App. 4th at 1406. And finally, Camacho could have reasonably avoided being the recipient of the dunning letters by obtaining insurance.

¶28 *Camacho* essentially holds that deceptive notices are not actionable in a case where the driver who complains about them admits to being at fault and uninsured. Under *Hangman Ridge*, however, a deceptive notice is actionable as long as the other four elements are established.

¶29 Washington's act does incorporate a yardstick of reasonableness by providing that practices which are "reasonable in relation to the development and preservation of business or which are not injurious to the public interest" are not violations. RCW 19.86.920. The "reasonableness defense" is appropriately submitted as a jury question if there are material issues of fact about its application. *See Travis v. Wash. Horse Breeders Ass'n*, 111 Wn.2d 396, 408-09, 759 P.2d 418 (1988). It is not a factor used in deciding whether a practice is deceptive.

¶30 The act is to be "liberally construed that its beneficial purposes may be served." RCW 19.86.920. The "laudable purpose" of the act is to protect Washington citizens from unfair and deceptive trade and commercial practices.

*Dwyer*, 103 Wn. App. at 547-48. The *Dwyer* court explained that its holding "protects Washington citizens by ensuring that they are clearly and accurately informed about the nature and extent of their obligations" under a mortgage agreement. "Our holding does not infringe on Kislak's right to charge a fax fee. It merely forecloses the ability to do so in a deceptive manner." *Dwyer*, 103 Wn. App. at 548. Similarly here, our conclusion that Credit's notices are deceptive protects Washington citizens by ensuring that they are clearly and accurately informed about the nature and extent of their obligations arising from being involved in an accident while driving a motor vehicle. Our holding does not infringe on the right of insurance companies to recover subrogation interests or to employ collection agencies to do so. But they may not overreach by using deceptive means to accomplish that objective.

¶31  Farmers contends that as a matter of law, representing a subrogation interest as an "amount due" cannot be deceptive because the collection of "alleged" debt is specifically contemplated by the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692. This argument is unfounded. The federal act does not regulate the collection of subrogation interests, whether "alleged" or reduced to judgment. It specifically regulates only the collection of consumer debt or alleged debt arising from a "transaction."[20] A "transaction" means a consumer obligation arising out of "consensual or contractual arrangements, not damage obligations thrust upon one as a result of no more than her own negligence." *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1369-71 (11th Cir. 1998). The same is true of the consumer protection provided by Washington's Collection Agency Act, chapter 19.16 RCW, which regulates the collection of "any obligation for the payment of money or thing of value *arising out of any agreement or contract*, express or

---

[20] "The term 'debt' means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5).

implied." RCW 19.16.100(5) (emphasis added). Unlike the collection of consumer debt, the collection of subrogation claims or tort claims is a type of activity that appears to be entirely unregulated.

¶32 Farmers complains generally that the plaintiffs are trying to use the Consumer Protection Act to make an end-run around regulatory statutes. The fact that a business operates in a highly regulated arena does not mean that its activities are exempt from liability under the Consumer Protection Act. That argument was made on behalf of mobile home park landlords in *Ethridge v. Hwang*, 105 Wn. App. 447, 457, 20 P.3d 958 (2001). The landlord argued that mobile home tenancies should be exempt from the Consumer Protection Act because of the specific regulations already found in the Manufactured/Mobile Home Landlord-Tenant Act, chapter 59.20 RCW. We rejected this contention, noting that "other heavily regulated areas of trade and commerce, such as the legal profession and the banking industry, are subject to the CPA [Consumer Protection Act]." *Ethridge*, 105 Wn. App. at 457 (citing *Meryhew v. Gillingham*, 77 Wn. App. 752, 754, 893 P.2d 692 (1995)). The area of debt collection is heavily regulated because of the "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). The absence of regulation specifically directed at collection of subrogation claims does not mean that debt collection practices used in the recovery of subrogation claims are exempt from suit under the act, and it does not undermine our conclusion that the practice here is deceptive.

¶33 The act does create a safe harbor for actions "permitted" by state and federal regulatory bodies and officers:

> Nothing in this chapter shall apply to actions or transactions otherwise permitted, prohibited or regulated under laws administered by the insurance commissioner of this state, the Washington utilities and transportation commission, the federal power commission or actions or transactions permitted by any other regulatory body or officer acting under statutory authority of this state or the United States.

RCW 19.86.170. But Farmers has not identified any regulatory entity that "permits" the collection practice at issue in this case. The most that can be said is that no regulatory entity has prohibited it. Farmers contends the collection scheme cannot be deemed deceptive because the insurance commissioner has not labeled it as such. This does not mean the commissioner has permitted it. In *Leingang*, the case on which Farmers relies, the claimant argued that a policy exclusion was necessarily an unfair trade practice because the insurance commissioner had not affirmatively approved it. The Supreme Court rejected this argument, finding no significance in the commissioner's silence. *Leingang*, 131 Wn.2d at 154. The commissioner's silence is equally insignificant in the context of these cases.

## TRADE OR COMMERCE

¶34 Deceptive acts "in the conduct of any trade or commerce" are unlawful. RCW 19.86.020. Trade and commerce "shall include the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." RCW 19.86.010(2). The legislature intended these terms to be construed broadly. *Hangman Ridge*, 105 Wn.2d at 785.

¶35 The defendants generally contend that the plaintiffs cannot satisfy the "trade or commerce" element because the plaintiffs were not involved in a consumer transaction. In support of this argument, they cite the federal Fair Debt Collection Practices Act. But the federal statute, as noted above, does not apply here. It applies only when an effort is made to collect a debt, i.e., an obligation arising from bilateral agreement. In contrast, our Consumer Protection Act applies to "any" trade or commerce affecting the people of the state of Washington, directly or indirectly. RCW 19.86.010(2). It shows "a carefully drafted attempt to bring within its reaches *every* person who conducts unfair or deceptive acts or practices in *any* trade or commerce." *Short v. Demopolis*, 103 Wn.2d 52, 61, 691 P.2d 163 (1984).

¶36 The sale of Credit's collection services to Omni and Farmers indisputably occurred in trade or commerce. Credit

contends this commerce did not affect the "consuming public" because Stephens and Panag are not consumers and therefore they lack standing to invoke the protection the act affords to consumers.

¶37 Neither the act nor *Hangman Ridge* mentions "the consuming public" or the idea of consumption as a limitation on the definition of "trade or commerce." Indeed, it is well settled that a consumer relationship is not a prerequisite for standing. *See, e.g., Escalante v. Sentry Ins. Co.*, 49 Wn. App. 375, 386-88, 743 P.2d 832 (1987) (estate of passenger in car accident had standing to sue the driver's insurer for bad faith in violation of the act even though she had no consumer relationship to the company), *disapproved on other grounds by Ellwein v. Hartford Accident & Indem. Co.*, 142 Wn.2d 766, 781 n.10, 15 P.3d 640 (2001). *Escalante* was cited with approval in *Washington State Physicians Insurance Exchange & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 312, 858 P.2d 1054 (1993).

¶38 Credit contends that under *Fisons*, a plaintiff who is not a consumer must at least stand in the shoes of someone who is. In *Fisons*, a physician sued a drug company for unfair and deceptive practices in failing to disclose the dangers of a drug. The drug company argued that the physician lacked standing because he was not the purchaser of the drug. The Supreme Court flatly rejected this argument based on the plain language of the statute: "Although the consumer protection statutes of some states require that the injured person be the same person who purchased goods or services, there is no language in the Washington act which requires that a CPA plaintiff be the consumer of goods or services." *Fisons*, 122 Wn.2d at 313.

¶39 In the next paragraph, by way of a supplemental rationale, the court recognized that the physician was well situated to prosecute the drug company's failure to give proper warnings:

> Additionally, in examining the nature of the relationship between a drug manufacturer, a prescribing physician and a

patient, it is the physician who compares different products, selects the particular drug for the ultimate consumer and uses it as a tool of his or her professional trade. Under the learned intermediary doctrine, a drug company fulfills its duty by giving warning regarding prescription drugs to the physician rather than to the patient. This unique relationship results in the physician being comparable to the ordinary consumer in other settings. Some cases have concluded that it is the physician who stands in the shoes of the "ordinary consumer" of the drug. Because of this unique relationship, the drug company targets its marketing efforts toward the physician, not toward the patient. The physician, therefore, is a logical person to be the "private attorney general" under RCW 19.86.090. We therefore conclude that Dr. Klicpera did have standing to bring a CPA claim, and that the trial court did not err in submitting this claim to the jury.

*Fisons*, 122 Wn.2d at 313 (footnotes omitted). Credit argues that the paragraph quoted above implicitly requires that a plaintiff who is not a consumer must at least be in a position to represent the interests of an "ordinary consumer."

¶40 This court has cited the second *Fisons* rationale in *State Farm Fire & Casualty Co. v. Quang Huynh*, 92 Wn. App. 454, 460, 962 P.2d 854 (1998) ("an insurance company is a logical party to be the private attorney general because it stands in the shoes of its premium-paying consumers who are affected by false billings from doctors"); *see also First State Ins. Co. v. Kemper Nat'l Ins. Co.*, 94 Wn. App. 602, 609-10, 971 P.2d 953 (1999) (excess insurer may assert a Consumer Protection Act claim which the insured could have brought against the primary insurer). But no case has held it indispensable for a plaintiff to be a representative of someone who has a consumer relationship with the defendants. Such a holding would be inconsistent with our recent decision in *Holiday Resort Community Ass'n v. Echo Lake Associates, LLC*, 134 Wn. App. 210, 219-20, 135 P.3d 499 (2006). The defendant in that case had no contractual or statutory relationship with the tenant plaintiffs. This court, citing the act's rule of liberal construction as well as *Short, Fisons, Escalante*, and *Quang Huynh*, concluded that it was

error to dismiss the case for lack of standing. "As a general rule, and as a matter of legislative intent, neither the CPA nor case law require privity of contract in order to bring a CPA claim alleging an unfair or deceptive act or practice." *Holiday Resort*, 134 Wn. App. at 219; *see also Nw. Airlines, Inc. v. Ticket Exch., Inc.*, 793 F. Supp. 976, 979 (W.D. Wash. 1992) (holding that once Northwest Airlines established all *Hangman Ridge* elements, it "need not prove it was a 'consumer' ").

¶41 The act simply does not require a consumer relationship as a prerequisite for standing. It does not identify the "consuming public" as the entity to be protected. *"Any person* who is injured in his or her business or property by a violation of RCW 19.86.020 . . . may bring a civil action in the superior court." RCW 19.86.090 (emphasis added). In *Hangman Ridge*, the Supreme Court described a "successful plaintiff" as "one who establishes *all* five elements of a private CPA action." *Hangman Ridge*, 105 Wn.2d at 795 (emphasis added). The concerns that typically underlie the issue of "standing" are already addressed by these elements, particularly the limitations imposed by the need to prove injury and public interest impact. *Fisons* did not add a sixth element requiring proof of an underlying consumer transaction.

¶42 In this case, it is the *absence* of an underlying consumer transaction that makes Credit's notices deceptive. They tend to create the impression that the recipient is a debtor when that is not so. The recipient is a logical "private attorney general" to argue that such deception is injurious to the public interest.

¶43 Because Credit conducts commerce with Omni and Farmers and their commerce directly or indirectly affects people of the state of Washington including uninsured drivers, we conclude that Credit's practice of sending the notices is one that occurred in trade or commerce.

## PUBLIC INTEREST IMPACT

¶44 Even a private plaintiff must "show that the acts complained of affect the public interest." This ele-

ment fulfills the legislative statement of purpose: that the act " 'shall not be construed to prohibit acts or practices which . . . are not injurious to the public interest.' " *Hangman Ridge*, 105 Wn.2d at 788 (alteration in original) (quoting RCW 19.86.920).

¶45 This is not a case where the public interest element is satisfied per se by a showing of conduct in violation of a statute containing a specific legislative declaration of public interest impact. Whether the public has an interest is therefore an issue to be determined by the trier of fact. The factors to be considered will depend upon the context in which the alleged acts were committed. *Hangman Ridge*, 105 Wn.2d at 789-90. For example, where the acts complained of involve "essentially a consumer transaction," such as the sale of goods, the following five factors are relevant:

> (1) Were the alleged acts committed in the course of defendant's business? (2) Are the acts part of a pattern or generalized course of conduct? (3) Were repeated acts committed prior to the act involving plaintiff? (4) Is there a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff? (5) If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it?

*Hangman Ridge*, 105 Wn.2d at 790. Where the complaint involves "essentially a private dispute," such as the provision of professional services, different factors are involved:

> (1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions?

*Hangman Ridge*, 105 Wn.2d at 790-91. No one factor is dispositive, nor is it necessary that all be present. *Hangman Ridge*, 105 Wn.2d at 791. In some cases, the public interest element may be satisfied even though "a neat distinction between consumer and private dispute is not

workable." *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 742, 733 P.2d 208 (1987).

¶46 The defendants would prefer to characterize these cases as private disputes. But even though the plaintiffs were not consumers, the relevant factors are those used for evaluating consumer transactions because they show how the practice has the potential of affecting large numbers of people. However the dispute arises, "it is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest." *Hangman Ridge*, 105 Wn.2d at 790.

¶47 The defendants do not and cannot seriously dispute that the sending of "formal collection notices" overstating subrogation claims as "amounts due" is a practice with a real and substantial potential for repetition. Nothing in the record suggests that these two cases are unique or isolated. The use of an identical scheme in California is reflected in *Camacho*. The notices received by Stephens and Panag appear to be form letters. Evidence in the record shows that Omni and Farmers frequently contract with collection agencies to collect money from drivers who have been involved in accidents with their insureds. Credit made a PowerPoint presentation to Farmers soliciting this type of business and representing that Credit's "subrogation coverage services" had been effective in realizing recoveries.[21] The presentation included the display of samples of a "formal collection notice" and a notice with a Western Union logo.

¶48 We conclude the practice complained of by Panag and Stephens satisfies the public interest impact element.

## INJURY AND CAUSATION

¶49 The plaintiff must have been "injured in his or her business or property" by the deceptive act. RCW 19.86.090. The defendants generally contend Panag and Stephens

---

[21] Clerk's Papers at 592-95.

cannot satisfy this element because neither one of them was actually induced to pay the "amount due" demanded by Credit's notices. Each responded to Credit's notices by obtaining advice of counsel. GEICO eventually made payment on behalf of Stephens. Panag was able to receive payment for her own injuries.

¶50 Stephens attributes several types of injury to the receipt of the "formal collection notice" from Credit—time lost from work and travel costs involved in consulting an attorney, the expense of purchasing a credit report ($49.95), and $9.95 per month he spent to sign up for a credit watch service after he filed suit.[22] The trial court found Stephens had established the injury element as a matter of law but reserved ruling on the precise amount of damages. When Panag received the notices from Credit, she already had an attorney who was representing her in matters connected with the underlying accident. She alleged that she incurred expense to obtain a credit report and to mail Credit's notices to her attorney. A different trial court dismissed Panag's claim on summary judgment on the basis that these expenses were insufficient to establish the element of injury.

¶51 The Supreme Court has explained that the element of injury does not require proof of monetary damages:

> In *Hangman Ridge* we held that while the injury need not be great, it must be established. In *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 733 P.2d 208 (1987), we distinguished between the terms "injury" and "damages" and held that "[t]his distinction makes it clear that no monetary damages need be proven, and that nonquantifiable injuries, such as loss of goodwill would suffice for this element of the *Hangman Ridge* test." The fact that the Act allows for injunctive relief bolsters the conclusion that injury without specific monetary damages will suffice. A loss of use of property which is causally related to an unfair or deceptive act or practice is sufficient injury to constitute the fourth element of a Consumer Protection Act violation.

---

[22] Clerk's Papers at 71.

*Mason v. Mortgage Am., Inc.*, 114 Wn.2d 842, 854, 792 P.2d 142 (1990) (alteration in original) (footnotes omitted) (quoting *Nordstrom*, 107 Wn.2d at 740).

¶52 The act speaks of injury to "business or property." Thus, mental distress, embarrassment, and inconvenience alone do not establish injury. But the scope of injury to "property" is especially broad and is not restricted to commercial or business injury. *Keyes v. Bollinger*, 31 Wn. App. 286, 296, 640 P.2d 1077 (1982). When a misrepresentation causes inconvenience that deprives the claimant of the use and enjoyment of his property, the injury element is satisfied. *See Tallmadge v. Aurora Chrysler Plymouth, Inc.*, 25 Wn. App. 90, 93-94, 605 P.2d 1275 (1979), *cited in Mason*, 114 Wn.2d at 854 n.19.

¶53 Credit inaccurately contends the plaintiffs are claiming only emotional injury, i.e., fear of damage to their credit records. The injury they claim is the time and expense of investigating their fear of damaged credit, not the fear itself. "The injury element will be met if the consumer's property interest or money is diminished because of the unlawful conduct even if the expenses caused by the statutory violation are minimal." *Mason*, 114 Wn.2d at 854. Costs incurred in investigating the effect of an unfair or deceptive act are sufficient to establish injury. *See Quang Huynh*, 92 Wn. App. at 470.

¶54 The defendants contend the plaintiffs' expenses related to obtaining legal advice did not constitute injury because the advice they received was in the context of the present litigation. They rely on *Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc.*, 64 Wn. App. 553, 564, 825 P.2d 714 (1992). In that case, a maker of signs deceptively induced a florist to sign a six-year lease for a sign and then sued her for the entire inflated cost when she refused to make the monthly payments. The florist counterclaimed and the jury found a violation of the Consumer Protection Act. On appeal, the signmaker unsuccessfully argued that the florist had not established an injury. This court found the injury element established by evidence that dealing

with the dispute took up so much of the florist's time that she was unable to tend to her store the way she normally would have. *Sign-O-Lite*, 64 Wn. App. at 564. But if she had relied solely on her involvement with the litigation precipitated by the dispute, the evidence would have been insufficient:

> Here, DeLaurenti's mere involvement in having to defend against Sign's collection action and having to prosecute a CPA counterclaim is insufficient to show injury to her business or property, contrary to the trial court's conclusion. To hold otherwise would be to invite defendants in most, if not all, routine collection actions to allege CPA violations as counterclaims.

*Sign-O-Lite*, 64 Wn. App. at 564.

¶55 The concerns underlying this holding in *Sign-O-Lite* are not present here because the collection Credit was attempting was not "routine" and the plaintiffs were not already defending a collection suit when they received the deceptive notices. The expenses Panag incurred in consulting her attorney were caused by her receipt of the notices, not by the accident itself, and thus cannot be seen as inhering in her personal injury claim. In addition, both Panag and Stephens paid for credit reports. However minimal these costs, we conclude the plaintiffs incurred them to find out whether they actually owed a debt in the "amount due" and to determine how to respond. This was sufficient to establish an injury caused by the deceptive practice.

¶56 In summary, we conclude both Panag and Stephens presented evidence sufficient to establish each of the five elements for violation of the Consumer Protection Act. The trial court erred in dismissing Panag's claim. Because the evidence is undisputed with respect to Stephens' claim against Credit, the trial court did not err in granting him summary judgment on that claim.

## OMNI'S LIABILITY TO STEPHENS

¶57 In the Stephens case, the trial court entered summary judgment as to liability against Omni as well as

Credit. Omni contends that liability for the letters, if any, should be imposed only on Credit.

¶58 The trial court did not find fault, nor do we, with the letters Omni sent before recruiting Credit's assistance. Stephens contends that Omni's violation of the act arises from its decision to hire a professional debt collector while fully realizing that no debt had yet been established. But the practice of referring a subrogation interest to a debt collector does not by itself have the capacity to deceive a substantial portion of the public. Credit could have sent out letters like Omni's.

¶59 Stephens argues that Omni and Credit were joint tortfeasors, but in this record there is no evidence of the collaboration or concerted action needed to establish that relationship. *See Elliott v. Barnes*, 32 Wn. App. 88, 90, 645 P.2d 1136 (1982). Stephens does not contradict Omni's David Quigley, who declares that Omni did not suggest or review the wording of Credit's letters:

> Omni retained Credit Collection Services to pursue recovery of its subrogation claims for the uninsured motorist benefits paid under Ms. York's policy. Omni referred the matter to CCS [Credit Collection Services] by sending it a copy of the medical bills and supporting documentation regarding Ms. York's claim. Omni has no relationship to CCS and retained them as an independent contractor. After sending these materials to CCS, Omni had no more involvement in CCS's efforts to collect the subrogation claim. Specifically, Omni does not exercise control over how CCS pursues recovery of subrogation claims. For example, Omni does not review letters or notices sent by CCS and has no input or involvement in wording, typeface, or format of these letters. Once a matter is referred to CCS, CCS has sole discretion over collection of the claim. CCS has sole discretion over whether to compromise the claim or agree to payment plans.[23]

¶60 The record likewise fails to support Stephens' argument that Omni was a concurrent tortfeasor. Concur-

---

[23] Clerk's Papers at 216-17 (Decl. of David Quigley).

rent tortfeasors are those whose independent acts breaching separate duties concur to produce the injury. *Seattle-First Nat'l Bank v. Shoreline Concrete Co.*, 91 Wn.2d 230, 235, 588 P.2d 1308 (1978). The mere referral of subrogation claims to Credit breached no duty.

¶61 Stephens also contends that Omni was vicariously liable for Credit's acts, either as a joint venturer or on the theory that Credit was Omni's agent. But taking the evidence in the light most favorable to Omni, Omni had no right of control over Credit's means of collection. The right to control is indispensable to vicarious liability. *See Adams v. Johnston*, 71 Wn. App. 599, 610-11, 860 P.2d 423 (1993) (joint venturers must have an equal right of control); *Kroshus v. Koury*, 30 Wn. App. 258, 267, 633 P.2d 909 (1981) (principal liable only for agent's activities over which principal has a right of control). Because Stephens has not shown that Omni controlled any aspect of notices sent by Credit, there was no basis upon which to impose vicarious liability. We conclude the trial court erred by granting summary judgment to Stephens in his claim against Omni.

## DENIAL OF CONTINUANCE

¶62 Credit assigns error to the trial court's refusal to continue the hearing on the motion for summary judgment in the Stephens case.

¶63 The court signed a stipulated discovery and motions schedule in May 2005. The order scheduled the deposition of Stephens for July 6, 2005, and it scheduled oral argument on all summary judgment motions for August 12, 2005. Later, with agreement of the parties, the court reset the date for oral argument to September 16, 2005. Stephens filed his motion for summary judgment in mid-August and noted the motion for argument on September 16 in accordance with the order.

¶64 Credit moved to postpone argument on the motion until November because of counsel's personal time conflict. In support of this motion, Credit argued that the parties had abandoned the stipulated scheduling order. The

court denied the motion and maintained the September 16 argument date, stating that counsel "had ample opportunity" to raise a scheduling issue earlier but did not do so.[24] Credit then filed a responding brief in which, for the first time, Credit said more time was needed to depose Stephens. The court denied the motion and proceeded to hear argument on September 16. The decision to grant or deny a continuance is discretionary. A court does not abuse its discretion in denying such a motion if the requesting party does not offer a good reason for the delay in obtaining the desired evidence. *Pitzer v. Union Bank of Cal.*, 141 Wn.2d 539, 556, 9 P.3d 805 (2000). The record here supports the trial court's exercise of discretion. Credit did not provide a good reason for failing to depose Stephens by the stipulated deadline.

## RES JUDICATA

¶65 After Stephens filed suit against Omni, Omni counterclaimed that Stephens was liable to Omni for the amount Credit had attempted to collect: $6,412. Four months before the summary judgment decision, Stephens confessed judgment in that amount in favor of Omni, and GEICO satisfied the judgment. Credit contends that the doctrine of res judicata precludes Stephens from continuing to litigate the present Consumer Protection Act case. However, Credit's appellate brief gives only passing treatment to this issue. Credit has particularly failed to explain how Omni's counterclaim against Stephens and the Consumer Protection Act claim Stephens brought against Credit are the same cause of action. *See Knuth v. Beneficial Wash., Inc.*, 107 Wn. App. 727, 732, 31 P.3d 694 (2001) (analyzing four factors to determine whether two causes of action are the same for res judicata purposes). We decline to review Credit's res judicata contention. *See Palmer v. Jensen*, 81 Wn. App. 148, 153, 913 P.2d 413 (1996) ("Passing treatment of an issue or lack of reasoned argument is insufficient to

---

[24] Clerk's Papers (Stephens) at 169.

merit judicial consideration."), *remanded on other grounds*, 132 Wn.2d 193, 937 P.2d 597 (1997).

## CR 12(b)(6) MOTION

¶66 Before Panag moved for summary judgment, Farmers moved to dismiss the action for failure to state a claim. Farmers assigns error to the trial court's decision denying this motion with respect to the Consumer Protection Act claim. We have decided that Panag presented sufficient evidence to meet each of the five elements of a Consumer Protection Act violation. It is implicit in our analysis that she stated a claim, and Farmers was not entitled to judgment on the pleadings. That order is affirmed.

## DISCOVERY ORDER

¶67 Although the trial court granted defendants' motion to dismiss Panag's action for failure to offer proof of a cognizable injury, the court believed that counsel for Panag should be allowed to continue with discovery in order to find a replacement plaintiff to continue the putative class action. The court signed a summary judgment order dismissing Panag but simultaneously ordering Farmers and Credit to provide contact information for persons who received similar notices and to indicate whether such persons had paid any money. Credit and Farmers appealed that decision, arguing that there is no recognized legal basis for permitting discovery to continue once the case before the court has been entirely resolved. This court granted Credit's and Farmers' motion for a stay of the discovery order pending our disposition of the case. Because we conclude the entry of summary judgment against Panag must be reversed, the discovery issue is now moot. The stay is lifted.

## CONCLUSION

¶68 The order granting Stephens' motion for partial summary judgment against Credit is affirmed. The order granting Stephens' motion for partial summary judgment

against Omni is reversed. The order granting the joint motion by Farmers and Credit for summary judgment against Panag is reversed.

SCHINDLER, A.C.J., and AGID, J., concur.

Reconsideration denied May 25, 2007.

Review granted at 164 Wn.2d 1012 (2008).