# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STEPHANIE LOCK, an individual, | ) | No. 79255-5-I |
| | ) | |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| AMERICAN FAMILY INSURANCE | ) | |
| COMPANY, a Foreign Corporation, | ) | PUBLISHED OPINION |
| doing business in Washington, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

MANN, A.C.J. — Stephanie Lock sued American Family Insurance Company (American Family) seeking coverage under her uninsured motorist (UIM) policy after she was injured in a motor vehicle accident. Her lawsuit included extra-contractual claims for common law insurance bad faith, violation of the Washington Consumer Protection Act (CPA), chapter 19.86 RCW, and violation of the Insurance Fair Conduct Act (IFCA), RCW 48.30.015. After a jury verdict in Lock's favor, the trial court granted a judgment notwithstanding the verdict (JNOV) on the extra-contractual claims. The trial court concluded that Lock failed to prove damages proximately caused by American

Family's bad faith and failed to demonstrate injury to business or property in support of her CPA claim. The trial court let stand the jury's $21,000 verdict on Lock's UIM claim.

Lock appeals and contends (1) the trial court erred by excluding evidence of American Family's bad faith conduct during litigation, (2) the trial court improperly granted a JNOV on the extra-contractual claims, and (3) the trial court improperly vacated its order granting attorney fees to Lock.

American Family cross appeals, contending, in part, that the trial court erred in failing to apply an offset to the UIM verdict to take into account payments made under Lock's Personal Injury Protection (PIP) policy.

We affirm in part, reverse in part, and remand for retrial on portions of Lock's insurance bad faith claim. We also remand for the trial court to offset the UIM verdict to take into account payments made under Lock's PIP policy.

I.

On February 22, 2013, Lock was rear-ended by an uninsured driver. An emergency room visit after the accident confirmed that Lock had no head injury, Computerized tomography (CT) scans of Lock's neck and back also confirmed no disk injury or fracture. Lock was discharged from the emergency room with a diagnosis of neck and back pain.

At the time of the accident Lock's auto insurance policy with American Family included PIP benefits of $35,000, available for up to 3 years of treatment, and UIM benefits of $100,000. American Family paid for the damage to Lock's car and extended rental coverage while she shopped for a new car. American Family also began paying

for Lock's medical treatments. As of March 1, 2013, American Family had resolved all of Lock's claims other than the resolution of her PIP and UIM claims.

Lock was treated by her long-time primary care physician, Dr. John Mayeno. At her March 27, 2013, examination–roughly one month after the accident–Dr. Mayeno noted full, pain free, range of motion in Lock's neck and back. The sole remaining issue was a trapezius spasm. Mayeno testified that Lock was fully recovered by early 2014, and that she had not suffered any permanent injury.

Lock was discharged from physical therapy to home exercise on December 18, 2013. Lock's last massage therapy appointment was December 9, 2013. A January 20, 2014, discharge note stated "Reason Given: She feels like she has recovered well." After Lock was involved in another motor vehicle accident in May 2014, Dr. Mayeno noted:

> Stephanie states that she was feeling much better in late December. Physical therapy was discontinued in late January and since early February she has felt well with no stiffness or pain in the neck or back.
>     . . . .
> Will close her claim from her [motor vehicle accident] dated 2/22/13 in view of her subjective clinical course of pain and spasm complaints which had resolved as of earlier this year, her discharge from physical therapy and her self-reported [independent medical exam (IME)] that was negative. She is in agreement with this plan. She will discuss this with her lawyer.

As required under her policy with American Family, Lock submitted to an independent medical exam (IME) with Dr. Dennis Chong in January 2014. Dr. Chong diagnosed Lock with soft tissue injuries, which he said should have fully healed two to three months after the accident. Dr. Chong found Lock to be "medically stationary" and capable of performing her "functional job duties and normal activities of daily living" at

the time of the examination. He indicated that "no further diagnostic testing or additional treatment is medically necessary."

As a result, American Family notified Lock on January 20, 2014, that it would not pay for any further medical treatments after January 14, 2014. The letter from American Family informed Lock that "[a]ny reductions in your client's billings or treatment not considered reasonable, necessary and related to your client's automobile accident are subject to rebuttal on your client's part." Lock did not dispute the IME.

American Family paid $13,541.98 of Lock's PIP benefits. All of Lock's medical bills were paid by American Family. American Family acknowledged that Lock was still seeking treatment for an injury in September 2013 and valued Lock's remaining insurance claim at up $8,500. American Family initially offered to settle for $5,000, and then increased its offer to $7,500 on December 15, 2014. Lock did not accept the $7,500 offer to settle.

Lock filed a UIM lawsuit against American Family in March 2015. Lock amended her complaint in November 2015, adding extra-contractual causes of action for violation of the IFCA, CPA, and a common law insurance bad faith claim. Lock alleged that American Family failed to reasonably investigate her claim, failed to explain its offer, and failed to reasonably communicate, leading her to file the UIM suit.

After Lock added her extra-contractual claims, American Family removed the case to federal court claiming an amount in controversy over $75,000. After a hearing, U.S. District Court Judge James Robart remanded the case back to the King County Superior Court on February 10, 2016.

4

After remand, trial was set for October 3, 2016, before King County Superior Court Judge Beth Andrus. On August 12, 2016, Judge Andrus denied American Family's motion for a continuance of the trial. The court then denied American Family's motion for a hearing on summary judgment on shortened time and denied American Family's request to calendar a hearing on its motion for summary judgment before trial. On September 1, 2016, American Family removed the case to the U.S. District Court a second time. American Family again alleged an amount in controversy in excess of $75,000. After removal, American Family filed the same summary judgment motion before the U.S. District Court.

American Family relied on Lock's statement of damages to support its claim that the amount in controversy exceeded $106,000. Lock's statement of damages identified $13,541.98 in special damages and identified that general damages for the IFCA, CPA, and bad faith claims were unknown as they would be determined by a jury. The statement of damages indicated that American Family had previously estimated the general damages as being a minimum of $92,709.90. Judge Robart rejected American Family's reliance on its own estimate of general damages and agreed with Lock that general damages would be determined by a jury. Judge Robart sanctioned American Family and remanded the case again after finding that American Family "flat-out lied to the Court" about the amount in controversy and used "cheap trial tactics" by removing the case in order to file its motion for summary judgment.

In superior court, on March 17, 2017, Judge Andrus set trial for May 1, 2017, deemed discovery complete, and once again denied American Family's request to calendar its motion for summary judgment due to its bad faith litigation tactics.

Judge Andrus granted American Family's motion in limine to exclude testimony from Lock's insurance expert, Mary Owen, about "choices litigation counsel made in this lawsuit" as irrelevant. The trial court allowed Owen to "opine regarding the substance of what American Family did or failed to do in investigating the Plaintiff's UIM claim or in explaining how it reached its decision to cut off Plaintiff's benefits."

On March 30, 2017, American Family's corporate counsel, Christopher Strickland, mailed a check for $4,135.75 and a cover letter directly to Lock's home. The cover letter was on letterhead from American Family "Claims Legal Division," and captioned with the case name and King County Superior Court case number. The letter stated "[e]nclosed please find a draft in the amount of $4153.75 made payable to you. Said draft represents full and final settlement of all claims in the above-captioned matter."

The case went to trial before King County Superior Court Judge Ken Schubert. Judge Schubert adopted Judge Andrus's pretrial order excluding evidence of American Family's bad faith conduct during litigation. The trial court interpreted the order to exclude all evidence of conduct after Lock's filing of her UIM complaint. The court concluded that "in my understanding of the orders that have been entered in this case, there was a clear line that's been drawn in the sand by Judge Andrus. After the filing of the complaint, conduct, bad faith, or good faith, doesn't come in." The court granted American Family's motions in limine excluding "evidence concerning litigation history, motions practice, or the Court's ruling."

The trial court also granted American Family's motions in limine excluding "any discussion of the [sanctions] check sent to Plaintiff for fees on remand." Similarly, the

trial court excluded "any reference to any emotional distress of plaintiff caused by this litigation."

At trial, Lock testified that American Family cut off her benefits, making her feel confused and betrayed. She claimed she was denied the full benefit of the PIP benefits, which she thought she was entitled to use for three years. Lock testified

> I was not done treating. I was transferred to home exercises with the caveat that I would go back if needed. My understanding of the letter was that I would have three years, $35,000 and, if needed, I could go back and have access to those benefits that my family has been paying for.

Lock confirmed that American Family paid all of the medical bills that she submitted. She claimed that she incurred economic damages of $18,000 for her expert.

While the pretrial motion in limine excluded discussion of the check sent by American Family's corporate counsel prior to trial, the trial court allowed the check and cover letter to be admitted after American Family's witness testified that American Family knew, that after Ms. Lock's attorney appeared to represent her, all contact with Ms. Lock had to go through her attorney. During her testimony, Lock was asked about her receipt of the check from American Family's in-house counsel. After American Family objected, the trial court made clear that "any kind of emotional or physical reaction to its receipt is postlitigation conduct and is not going to come in. It's not going to support any kind of emotional distress."

On the third day of trial, the trial court ruled, and Lock's counsel agreed, that American Family's decision not to pay the $7,500 it offered in late 2014, did not support a claim for damages:

> THE COURT: The concern by American Family is that you are going to argue that the failure to pay either the 5,000 or the 7,500, neither of which were offers that were accepted by your client, that the failure to make that

7

payment, absent the acceptance, was actually some kind of breach by American Family. And that's not what I understood, necessarily, you were trying to say from your opening. I understand why they're concerned about that and why it might need to be clarified in some way to the jurors that you're just letting the jurors know your client never received that money.

MS. SARGENT: That's right.

THE COURT: The reason why they never received that money, is because your client never accepted those offers. But the failure for American Family to actually have paid that money to your client, you're not contending, supports any kind of breach. They had no obligation to actually write those checks absent an agreement by your client to accept a settlement of her UIM claim, right?

MS. SARGENT: This is, I do believe, correct, Your Honor.

At the conclusion of testimony, Lock requested that the jury be instructed that the sending of the settlement check was evidence of bad faith conduct. Lock's counsel argued that if Lock had been allowed to testify she would have explained "when she got this check, she called me up yelling and screaming at me, sobbing and crying and asking me why I settled for a case behind her back for less than what they were initially offered her. It caused conflict. It caused her lack of sleep." The trial court denied the request concluding that "there's no damages."

During closing argument, and contrary to prior agreement, Lock's counsel did rely on the unaccepted $7,500 settlement offer as evidence of damages:

[MS. SARGENT]: Question No. 8: Did American Family violate the Consumer Protection Act? "Yes."

Did Stephanie sustain any damages? Question No. 9. "Yes."

The damages there, Question No. 10? Well, that last offer that they made her, the $7,500? They should have paid that. That's an amount that they figured right then and there. No, we don't have any dispute with this amount. We have zero dispute with the amount of $7,500. They should have paid that amount.

And those would be her damages we're seeking.

8

Also during closing argument, Lock's counsel asked the jury to impose a large damage award, and contrary to the pretrial order in limine, effectively "send a message" to American Family:

> MS. SARGENT: Question No. 3 is did American Family's failure to act in good faith proximately cause damage to Stephanie Lock?
> The answer to that should be yes.
>
> And this is where I told you this is a big damages case. What you're deciding here is important. What you're deciding in this case right now is how insurance companies will be able to treat citizens in this state. That's what this case will establish. That's the importance of what you guys are doing right now. And the damages that you award have to be such that they don't go back into the boardroom and go, "Phew, just the cost of doing business, dodged the bullet there." It has to be such that it doesn't happen again. That's what this case was about, that's what you guys are doing for the citizens of this state right now.
>
> That's why the range that I suggested–and I'll say it again–seventeen thousand [sic] [million] four hundred and sixty-five thousand two hundred and eighty dollars or $5,821,760. That's the range. Unless you don't think that's enough. If you don't think that would stop this sort of behavior, then you increase it.
>
> But that is why we are here. That is why we are here. We do not want insurance companies to do in this case ever again. We don't want that to happen. We have specific laws, we have specific regulations, we have common law that is supposed to stop this sort of conduct. And it's not often that it happens. That's why it is important for you to stop it now.

The jury awarded Lock $21,000 for her UIM claim. The jury also found American Family did not act in good faith and awarded $413,575 on the bad faith claim. Similarly, the jury found American Family had violated the CPA and awarded $8,500 on the CPA claim. The jury found that American Family had not violated the IFCA.

After the verdict, American Family moved for a JNOV, which the trial court granted. The trial court's order granting a JNOV contained 19 unchallenged findings of fact, including:

9

- Lock did not present evidence of damages to business or property proximately caused by American Family.

- All of Lock's bills were timely paid by American Family and there was no evidence of out of pocket expenses not paid by American Family.

- There was no evidence of any damage proximately caused by American Family.

- The reserve set by American Family was $8,500 prior to litigation.

- American Family's last prelitigation offer was $7,500 which Lock did not accept.

- Lock presented no evidence that she would have accepted an $8,500 offer.

- Lock agreed that she was not seeking to establish extra-contractual liability based on the failure to pay an unaccepted settlement amount.

- Contrary to this agreement, Lock's counsel argued to the jury during closing argument that American Family should have paid the $7,500 as the basis for the CPA damages.

- The jury found that American Family had not unreasonably denied a claim or benefit.

- Lock presented no evidence of damages proximately caused by American Family's bad faith.

- Lock presented no evidence of damages associated with the sanctions check for $4,135.75 and that Lock could not argue this evidence as a damage to the jury.

- "The jury's bad faith award of $413,575.00 uses the identical numerals as found in the [sanction check] but simply add two zeros on to the end. The jury's decision to award $413,575.00 appears to be based entirely upon [the sanctions check] . . . which basis would be contrary to the Court's order."

Based on its findings, the trial court concluded that:

2. Plaintiff failed to present evidence sufficient to establish a prima facie case for a Consumer Protection Act violation due to her failure to establish damage to her business or property.

10

3.      Plaintiff's failure to prove evidence of damages to business or property renders the jury's verdict awarding Consumer Protection Act damages unsupportable as a matter of law.

4.      Because there were no damages proven, the jury's finding of a Consumer Protection Act violation is improper as a matter of law.

5.      Plaintiff's argument to the jury that American Family should have paid unaccepted settlement amounts improperly appealed to the prejudice of the jury when Plaintiff was aware this was not a proper basis for liability pursuant to the Consumer Protection Act. Plaintiff's argument was directly contrary to a standing Court Order.

6.      Plaintiff's argument to the jury that it should punish American Family for Trial Exhibit 61 [the sanctions check] appealed to the prejudice of the jury when Plaintiff was aware this was not a proper basis for liability. Plaintiff's argument was directly contrary to a standing Court Order.

7.      Plaintiff's failure to prove evidence of damages proximately caused by any bad faith action of American Family renders the jury's bad faith damages award improper as a matter of law.

8.      There is no reasonable conclusion that the jury's award of $413,575.00 could have been based on anything other than the check in the amount of $4,135.75 that American Family sent directly to Plaintiff and which did not cause Plaintiff any damages.

9.      Emotional distress damages caused by litigation are not recoverable as a matter of law.

10.     As a matter of law, there is neither evidence nor a reasonable inference therefrom sufficient to sustain the verdicts entered in plaintiff's favor. The jury founded its verdicts on mere theory or speculation, which verdicts cannot stand.

The trial court dismissed Lock's CPA and bad faith claims as a matter of law.

The trial court let stand the jury's verdict awarding $21,000 on Lock's UIM claim.

The trial court then granted Lock fees for American Family's bad faith litigation tactics.  After a motion for reconsideration the trial court vacated the award of attorney fees.

11

Lock petitioned for review directly to the Washington Supreme Court. American Family cross appealed. The Supreme Court denied review and remanded to this court.

II.

Lock argues first that the trial court erred in excluding evidence of American Family's litigation conduct after the filing of her UIM litigation. Lock contends that American Family's conduct during litigation supports her bad faith, CPA, and IFCA claims, and the exclusion of this evidence denied her the right to present facts to the jury.

We review a trial court's evidentiary rulings for an abuse of discretion. State v. Ellis, 136 Wn.2d 498, 504, 963 P.2d 843 (1998). An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court. Ellis, 136 Wn.2d at 504. Evidentiary determinations are within the sound discretion of the trial judge and will not be disturbed on appeal in the absence of proof of a manifest abuse of discretion. State v. Swan, 114 Wn.2d 613, 645, 790 P.2d 610 (1990).

A primary purpose for the regulation of the insurance industry "is to create public confidence in the honesty and reliability of those who engage in the business of insurance." Panag v. Farmers Ins. Co. of Wash, 166 Wn.2d 27, 43, 204 P.3d 885 (2009). In general, "an insurance company has an elevated or 'enhanced' duty of good faith which requires it to 'deal fairly' giving 'equal consideration' to its insureds. Van Noy v. State Farm, 142 Wn.2d 784, 794, 16 P.3d 574 (2001) (quoting Tank v. State Farm Fire & Cas. Co., 105 Wn.2d 381, 386, 715 P.2d 1133 (1986)). As explained in the insurance code:

> The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and

practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance.

RCW 48.01.030.

The insurer's duty, however, is different in the context of defending against UIM claims. Unlike primary coverage, UIM insurance provides an extra layer of coverage "designed to provide full compensation for all amounts that a claimant is legally entitled to where the tortfeasor is underinsured." Elwein v. Hartford Acc. & Indem. Co., 142 Wn.2d 766, 779-80, 15 P.3d 640 (2001), overruled on other grounds by Smith v. Safeco Ins. Co., 150 Wn.2d 478, 78 P.3d 1247 (2003). "'Legally entitled to' is the operative phrase, as a UIM insurer 'stands in the shoes' of the tortfeasor, and its liability to the insured is identical to the underinsured tortfeasor's up to the UIM policy limits." Ellwein, 142 Wn.2d at 780. As a result, "UIM coverage requires that a UIM insurer be free to be adversarial within the confines of the normal rules of procedure and ethics. To require otherwise would contradict the very nature of UIM coverage." Ellwein, 142 Wn.2d at 780.

While primarily a discovery case, Richardson v. Gov't Emps. Ins. Co., 200 Wn. App. 705, 403 P.3d 115 (2017), review denied, 190 Wn.2d 1008, 414 P.3d 575 (2018), is instructive on the issue of whether an attorney's actions after the filing of a UIM lawsuit are relevant. After being injured in an automobile accident, Christine Richardson filed a claim for PIP coverage and UIM coverage with her insurer Government Employees Insurance Company (GEICO). GEICO determined that an underlying settlement and Richardson's PIP coverage fully compensated her and therefore denied her UIM coverage. Richardson, 200 Wn. App. at 707.

13

A year later, Richardson filed a complaint against GEICO, alleging, among other claims, bad faith resulting from GEICO's handling of her PIP and UIM claims. Id. at 708. During discovery, Richardson sought a copy of GEICO's attorney's litigation file and sought to depose the attorney. GEICO's attorney moved to quash the subpoena and for a protective order, arguing that postlitigation documents were protected by attorney-client privilege and the work product doctrine. The trial court disagreed and ordered that Richardson could seek otherwise privileged postlitigation information. Id. at 709-10. GEICO sought interlocutory appeal, which was granted.

Division Two of this court reversed. The court distinguished between prelitigation conduct and postlitigation conduct in UIM litigation based on the principle that "the UIM insurer 'may defend as the tortfeasor would defend' and 'is entitled to counsel's advice in strategizing the same defenses that the tortfeasor could have asserted.'" Id. at 714-15 (quoting Cedell v. Farmers Ins. Co., 176 Wn.2d 686, 697, 295 P.3d 239 (2013)). The court explained:

> Allowing Richardson to access privileged information between GEICO and its attorney as to events that occurred after GEICO made its decision regarding the UIM claim and made after Richardson filed suit would run afoul of the purpose of the attorney-client privilege, the work product doctrine, and the purposes of discovery. Attorney work product that occurs after the filing of a lawsuit often contains the lawyer's assessment of the case, trial strategy, and impressions of witnesses. Here, the litigation file is irrelevant to Richardson's UIM claim.

Richardson, 200 Wn. App. at 716-17. The court further explained:

> the proposition that an insurer's privileged postlitigation materials are discoverable in a UIM context is contrary to public policy. We agree with the federal courts that have held that evidence of an insurer's litigation conduct is rarely admissible because it lacks probative value and has a high risk of prejudice:

14

> Allowing litigation conduct to serve as evidence of bad faith would undermine an insurer's right to contest questionable claims and to defend itself against such claims. . . . [P]ermitting allegations of litigation misconduct would have a "chilling effect on insurers, which could unfairly penalize them by inhibiting their attorneys from zealously and effectively representing their clients within the bounds permitted by law."  Insurers' counsel would be placed in an untenable position if legitimate litigation conduct could be used as evidence of bad faith.
>
> Other remedies are available to a plaintiff asserting such a claim under the rules of civil procedure.  Examples of redress for improper litigation conduct include "motions to strike, compel discovery, secure protective orders, or impose sanctions."
>
> We agree with the public policy concerns discussed above, particularly in light of the adversarial relationship between insurers and insureds in UIM bad faith actions.

Richardson, 200 Wn. App. at 719-20 (quoting Timberlake Const. Co. v. United State Fid. & Guar. Co., 71 F.3d 335, 341 (10th Cir. 1995) (citations omitted) (quoting Int'l Surplus Lines Ins. Co. v. Univ. of Wyoming Research Corp., 850 F.Supp. 1509, 1529 (D. Wyo. 1994), aff'd sub nom. Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc., 52 F.3d 901 (10th Cir. 1995)).

We also agree with the public policy concerns discussed in Richardson with respect to postlitigation conduct of counsel during UIM litigation.  Lock was notified on January 20, 2014, that American Family would not pay for any further medical treatments after January 14, 2014.  Over a year later, in March 2015, Lock filed her UIM lawsuit against American Family.  With the filing of the UIM litigation, the nature of the relationship between Lock and American Family became adversarial, bound by the normal rules of procedure and ethics.  Ellwein, 142 Wn.2d at 780.  By the time Lock

15

sued, any claim investigation and evaluation had ceased.[1]  Postlitigation conduct of the insurer's counsel is not the basis for liability for insurance bad faith.  The remedy for bad litigation conduct is properly through motions to strike, compel discovery, secure protective orders, or impose sanctions—such as what both Judge Robart and Judge Andrus did here.  Richardson, 200 Wn. App. at 719-20.

The trial court did not abuse its discretion in excluding the postlitigation conduct of trial counsel, including evidence of bad faith in the filing of untimely motions for summary judgment and removing the case to federal court.

The trial court did, however, abuse its discretion by excluding evidence of damages related to American Family's action directly sending the $4,153.75 check to Lock.  As Lock correctly points out, the adversarial nature of UIM litigation is still bounded by a reasonable expectation of good faith.  Conduct is confined by the "normal rules of procedure and ethics."  Ellwein, 142 Wn.2d at 780.  "'The insurer must deal in good faith and fairly as to the terms of the policy and not overreach the insured, despite its adversarial interest.'"  Ellwein, 142 Wn.2d at 780-81 (quoting Hendren v. Allstate Ins. Co., 100 N.M. 506, 672 P.2d 1137 (Ct. App. 1983)).

In Ellwein, for example, during its investigation of an accident involving its insured, Nancy Ellwein, Hartford Insurance retained an accident reconstruction expert, William Cooper.  Based on statements from witnesses, Cooper opined that Ellwein was not at fault.  Ellwein, 142 Wn.2d at 769.  Hartford used Cooper's report as the basis of submitting its demand to Safeco Insurance.  Unbeknownst to Ellwein, however, at the

---

[1] Lock contends that American Family continued to process the claim based on trial counsel's settlement offer of $15,000 during litigation.  We agree with American Family that settlement offers made by counsel during litigation are not claims investigations.

same time it was processing Ellwein's claim, Hartford also was preparing for an anticipated UIM claim by Ellwein. Hartford provided Cooper with additional information regarding the accident. After Ellwein submitted a UIM arbitration demand, Hartford provided a revised declaration by Cooper opining that the accident was solely the fault of Ellwein. Id. at 771.

The Supreme Court found Hartford's conduct bad faith as a matter of law. First, because Hartford clearly understood that Cooper was Ellwein's expert and intended to manipulate his conclusions in their favor. Id. at 781. And second, because, as a rule, an insurer cannot use and manipulate an insured's expert during the time when the "insurer clearly owes the insured a duty to not self-deal." Id. at 782.

Here, in contrast to the postlitigation conduct of trial counsel, American Family's corporate counsel directly communicated with Lock by mailing a check that purported to "represent full and final settlement of all claims." This direct communication by American Family's corporate counsel was a violation of the IFCA as a "defined unfair or deceptive act[ ] or practice[ ] of the insurer." WAC 284.30.330(19).[2] Direct contact by American Family's corporate counsel also violates the Rules of Professional Conduct. RPC 4.2.[3] As American Family's representative Wade Nielson confirmed in his testimony, American Family knew that it was prohibited from having direct contact with Lock once she was represented. This conduct was outside the "normal rules of

---

[2] WAC 284.30.330(19) defines as an unfair or deceptive act "Negotiating or settling a claim directly with any claimant known to be represented by an attorney without the attorney's knowledge and consent."

[3] "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."

17

procedure and ethics" and outside an insured's reasonable expectation of good faith conduct.

While the trial court did not err in admitting American Family's letter and check, it erred in excluding evidence of damages, including emotional distress that Lock may have experienced in response. We remand for retrial of Lock's claim for common law insurance bad faith based on American Family's conduct directly contacting Lock pretrial.[4]

III.

Lock argues next that the trial court erred in granting a JNOV on the extra-contractual claims. We disagree.

We review a JNOV under the same standard as the trial court. Goodman v. Goodman, 128 Wn.2d 366, 371, 907 P.2d 290 (1995). A JNOV is only appropriate where the court can find, "as a matter of law, that there is neither evidence nor reasonable inference therefrom sufficient to sustain the verdict." Brashear v. Puget Sound Power & Light Co., 100 Wn.2d 204, 208-09, 667 P.2d 78 (1983) (quoting Hojem v. Kelly, 93 Wn.2d 143, 145, 606 P.2d 275 (1980)). "A motion for a JNOV admits the truth of the opponent's evidence and all inferences that can be reasonably drawn therefrom, and requires the evidence be interpreted most strongly against the moving party and in the light most favorable to the opponent. No element of discretion is involved." Goodman, 128 Wn.2d at 371.

---

[4] Lock also argued that the trial court erred in vacating its order granting her attorney fees for American Family's bad faith litigation tactics. Because we are remanding for trial on Lock's claim of bad faith, we also vacate the trial court's order awarding or denying attorney fees. Any claims for fees should be addressed on remand.

A.

Lock contends that the trial court substituted its judgment for the jury's in finding that she failed to prove damages proximately caused by American Family's bad faith. This is so, she asserts because the jury (1) knew American Family cut off her benefits, (2) knew that American Family failed to investigate fairly by not providing Dr. Chong with all of her medical records and not consulting with her treating physician, (3) knew that she had to hire an expert whose bill was in excess of $18,000, and (4) knew it was improper for American Family's corporate counsel to send the check claiming to settle all claims directly to her.

First, there was no evidence American Family denied or cutoff Lock's insurance benefits. The jury was asked by special verdict "Did American Family unreasonably deny a claim or benefit?" The jury responded "no." Further, Lock did not present evidence of any medical treatment that American Family did not pay. Nor did she present evidence of any out-of-pocket expenses.

Second, there was no evidence that Lock was damaged by the IME review and conclusion. Lock's treating physician, Dr. Mayeno, testified that by February 2014, Lock reported being pain free. Mayeno further testified that between February 2014 and her second accident in May 2014, Lock had fully recovered and that there was no permanent injury of any kind.

Third, while attorney fees and expert costs are a recoverable damage in a bad faith claim for insurance coverage denial under Olympic S.S. Co., Inc., v. Centennial Ins. Co., 117 Wn.2d 37, 811 P.2d 673 (1991), Lock's claim was based on the value paid for her claim. Value disputes are not coverage denials. "[T]he Olympic S.S. Co. rule

applies only to disputes over coverage, and not to disputes over the amount of a claim." Gossett v. Farmers Ins. Co., 133 Wn.2d 954, 982, 948 P.2d 1264 (1997) (citing Dayton v. Farmers Ins. Group, 124 Wn.2d 277, 280-81, 876 P.2d 896 (1994)).

However, as discussed above, the trial court erred in excluding evidence of damages that might have resulted from American Family's direct contact with Lock. The trial court's conclusion in its JNOV that there was no evidence of damages to support Lock's claim of bad faith insurance coverage was erroneous.

B.

Lock next contends that the trial court erred in finding and concluding that she failed to prove evidence of damages to business or property which rendered her CPA claim unsupportable as a matter of law. Lock asserts that she: "felt betrayed and was inconvenienced, she had to file a lawsuit, prepare her case, attend depositions and hire an insurance expert whose bill was already $18,000 at the time of trial." We disagree.

In order to maintain an action for a private CPA violation, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) in the conduct of trade or commerce, (3) which impacts the public interest, (4) injury to the plaintiff in their business or property, and (5) a causal link between the unfair or deceptive act and the injury suffered. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780, 719 P.2d 531 (1986).

At issue is whether Lock demonstrated injury to her business or property. While "the injury need not be great, it must be established." Mason v. Mortgage America, Inc., 114 Wn.2d 842, 854, 792 P.2d 142 (1990). Monetary damages are not necessary, "nonquantifiable injuries, such as loss of goodwill" suffice. Nordstrom, Inc. v.

Tampourlos, 107 Wn.2d 735, 740, 733 P.2d 208 (1987) (injury to reputation and goodwill sufficient); Mason, 114 Wn.2d at 855 (temporary loss of title to property is an "injury to property").

Lock relies on St. Paul Fire & Marine Ins. Co. v. Updegrave, 33 Wn. App. 653, 658-59, 656 P.2d 1130 (1983), to support her argument that the inconvenience and financial considerations of preparing her case, time spent in court, litigation costs, and expert witness fees, are sufficient evidence of injury to support a CPA claim. St. Paul Fire, was decided prior to our Supreme Court holding in Hangman Ridge, that evidence of injury to business or property was required. As this court subsequently explained in Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc., 64 Wn. App. 553, 563-64, 825 P.2d 714 (1992), the holding in St. Paul Fire, was too broad. Involvement in prosecuting a CPA claim is insufficient to show injury to business or property. Sign-O-Lite, 64 Wn. App at 564. See also Demopolis v. Galvin, 57 Wn. App. 47, 54-55, 786 P.2d 804 (1990) (the cost of instituting a CPA action to challenge an underlying loan agreement could not, itself, constitute injury); Panag, 166 Wn.2d at 60. Lock's claim of the inconvenience and expense of prosecuting her CPA claim does not support a claim for injury to business or property.[5]

Lock also contends that she was denied the opportunity to present evidence of emotional distress damages resulting from her receipt of the check from American Family's counsel. But "[p]ersonal injuries, as opposed to injuries to 'business or property,' are not compensable and do not satisfy the injury requirement." Panag, 166

---

[5] In Sign-O-Lite, we agreed that the evidence supported injury to the business where the plaintiff, who was self-employed, testified that she was unable to tend her store and was drawn away from her business and consulting work in order to address her claims against the defendant. 64 Wn. App. at 564. Lock did not demonstrate a similar injury to her business.

Wn.2d at 57. "Thus, damages for mental distress, embarrassment, and inconvenience are not recoverable under the CPA." Id.

The trial court did not err in concluding that Lock failed to present evidence of injury to her business or property and thus the jury's verdict awarding CPA damages was unsupportable as a matter of law.

IV.

On cross appeal, American Family argues that it was entitled to offset the jury's $21,000 UIM award with the payments it made for Lock's medical bills under her PIP coverage. We agree.

Construction of an insurance policy is a question of law for the courts that we review de novo. Wood v. Mut. of Enumclaw Ins. Co., 97 Wn. App. 721, 723, 986 P.2d 833 (1999). The insurance policy is construed as a whole. Safeco Ins. Co. v. Woodley, 102 Wn. App. 384, 391, 8 P.3d 304 (2000), review granted in part, cause remanded, 145 Wn.2d 1032, 42 P.3d 1278 (2002). "An 'offset' refers to a credit to which an insurer is entitled for payments made under one coverage against claims made under another coverage within the same policy." Winters v. State Farm Mut. Auto. Ins. Co., 144 Wn.2d 869, 876, 31 P.3d 1164 (2001). When an insurance contract contains a clear offset clause, the contract clause should be given effect "to the extent that the insured remains fully compensated for his or her damages." Wood, 97 Wn. App. at 724.[6]

In Woodley, Denise Woodley appealed a declaratory judgment permitting her insurer to offset her UIM benefits with the benefits the insurer had already paid in PIP benefits to prevent Woodley from receiving a double recovery. Woodley, 102 Wn. App.

---

[6] In Wood, the court held that a UIM award may be offset by PIP payments. Wood, 97 Wn. App. at 724.

at 386.  The insurance contract included a right to recover provision.  Woodley, 102 Wn. App. at 392.  Woodley argued that Safeco waived its right to offset and that the insurance policy did not unambiguously permit Safeco to offset the full amount of her settlement.  Woodley, 102 Wn. App. at 391, 393.  The court held that Safeco did not waive its right to make the UIM offsets because Safeco had notified Woodley of its intent to offset.  Woodley, 102 Wn. App. at 393.  The court held that because "the average person purchasing insurance would understand that medical and PIP benefits paid under the policy will reduce the insured's UIM recovery," the trial court did not err by deducting the amount of the liability settlement from the award.  Woodley, 102 Wn. App. at 391, 395.

Here, the trial court granted Lock's motion to amend her complaint on November 25, 2015.  On April 14, 2017, American Family answered Lock's amended complaint.  American Family filed the answer and affirmative defenses to the amended complaint after the close of discovery and after multiple trial continuances.  American Family pleaded the following defenses:

> Affirmative defense 4: "Plaintiff's recovery, if any, is limited to the terms and conditions of the Insurance Contract."

> Affirmative defense 7:  "To the extent that Defendant overpaid on any of Plaintiff's claims, Defendant is entitled to an offset."

Relevant to affirmative defense 4, Lock's insurance contract with American Family provides: "No one will be entitled to duplicate payments for the same elements of loss.  Any amount we pay under this Part to or for an injured person will be reduced by any payment made to that person under any other Part of this policy."  Thus, both affirmative defenses provided for an offset.

Lock moved to strike American Family's answer and affirmative defenses. The trial court addressed each affirmative defense separately. The court denied the motion to strike affirmative defense 4, finding that it was not an affirmative defense that must be specifically pleaded. The court granted the motion to strike affirmative defense 7, finding that RCW 4.32.150 requires a defendant to plead the right to a setoff and that American Family failed to do so until after the close of discovery.

Thus, while the court found that American Family waived its right to assert an offset, it also found that the plaintiff's recovery was limited to the terms of the insurance contract. The insurance contract prohibits double payments for the same injury. The jury granted Lock $21,000 for her UIM claim. American Family had paid Lock $13,129.55 per her PIP benefits prior to trial.

Similar to Woodley, Lock was on notice about American Family's intent to offset, due to the insurance contract and the affirmative defense that American Family asserted. An average person reading Lock's insurance contract would understand that PIP benefits paid under the policy would reduce the insured's UIM recovery. The court found that Lock's UIM claim is governed by her contract with American Family. The insurance contract contains a clear offset clause. Because the trial court found that Lock's recovery was limited by the terms of the insurance contract, it erred by failing to apply the contractual offset to the UIM award. On remand, the trial court should offset the UIM award.

V.

American Family raises several additional issues on cross appeal. We address each in turn.

American Family first claims that the trial court erred in concluding that it was not the prevailing party under CR 68. Because we reverse the trial court's dismissal of Lock's insurance bad faith claims and remand for retrial, a determination of the prevailing party is premature.

American Family next contends that the trial court erred in allowing introduction of exhibit 61—the $4,135.75 check and cover letter—as impeachment evidence. American Family's argument is based on the assumption that the pretrial order excluding evidence of the check was correct. As discussed above, evidence of American Family's direct contact with Lock, and any resulting damages, should have been admissible to support her bad faith insurance claim. Thus, we need not address American Family's argument that it was inadmissible as impeachment evidence.

Finally, American Family argues that the trial court erred in failing to bifurcate trial on the insurance bad faith claim and UIM claim. Because we reverse only the order dismissing Lock's insurance bad faith claim, we need not address this issue.

VI.

We affirm the trial court's order excluding postlitigation conduct of trial counsel. We also affirm the trial court's JNOV dismissing Lock's CPA claim.

We reverse the trial court's order excluding evidence of American Family's direct contact with Lock during litigation, and any resulting damages supporting her insurance bad faith claim. We also reverse the trial court's JNOV dismissing Lock's insurance bad faith claim.

We remand for a new trial on Lock's insurance bad faith claim based on American Family's direct contact during litigation.

We remand for the trial court to offset the jury's award on Lock's UIM claim by the amount paid under her PIP policy.

We vacate the trial court's decision on attorney fees.

Because neither party fully prevails on appeal we decline to award attorney fees on appeal.

Affirmed in part, reversed in part, and remanded.

_____
Mann, A.C.J.

WE CONCUR:

_____                    _____
                                                    Leach, J.